CHARLESTON.

SMITH *v.* BROWN *et al.*

Submitted September 6, 1897—Decided March 23, 1898.

1.  COMMISSIONER'S REPORT—*Exceptions—Waiver.*
       Where a party files exceptions to a commissioner's report with-
    in the ten days which the same is required by statute to be held
    by the commissioner before filing, and asks leave to file other ex-
    ceptions during the term before the submission of the cause, and
    does so file such other exceptions, he must be held to have waived

his right to except because the report was not held full ten days before filing.  (p. 359).

2.  STATUTE OF LIMITATIONS—*Pleading—Waiver.*

Before a party can have the benefit of the bar created by the statute of limitations, he must plead the statute, or in some manner indicate his intention to claim the benefit of it; otherwise, it will be considered by the court to be waived.  (p. 362).

3.  STATUTE OF LIMITATIONS — *Partnership — Actions Between Partners.*

In order to subject an action of one partner against his co-partner to the bar of the statute of limitations, it must not only appear that there has been a dissolution of the partnership more than five years before the institution of the suit, but that there were no valid claims of debit or credit against or in favor of the firm paid or received or outstanding within that time.  *Sandy* v. *Randall*, 20 W. Va., 244.  (p. 362).

4.  PARTNERSHIP—*Compensation—Salary—Commission.*

Under ordinary circumstances, and in the absence of an agreement to that effect, one partner cannot charge his co-partners with any sum for compensation, whether in the shape of salary, commission, or otherwise, on account of his own trouble in conducting the partnership business, and in this respect a managing or acting partner is in no different position from any other partner.  *Hyre* v. *Lambert*, 37 W. Va., 26.  (p. 364).

5.  RECEIVERS—*Discretion of Court—Review on Appeal,*

Courts are possessed of discretionary powers, with certain statutory restrictions in this State, of appointing receivers or refusing applications for such appointment; and the exercise of such discretion will not be interfered with on appeal, except in cases where this discretion has been manifestly abused.  (p. 364).

Appeal from Circuit Court, Harrison County.

Bill by A. G. Smith against B. H. and J. W. Brown to dissolve the partnership of Smith, Brown & Co.   From a decree for complainant, defendants appeal.

*Reversed.*

JOHN J. DAVIS and EDWIN G. SMITH, for appellants.
JOHN BASSEL and W. P. HUBBARD, for appellee.

McWHORTER, JUDGE:

On the 11th of August, 1870, A. G. Smith, B. H. Brown, and J. W. Brown entered into a written contract, forming a co-partnership, under the name of Smith, Brown & Co.,

to carry on the business of "general merchandising" for the term of five years from said 11th day of August, 1870, such business to be carried on at Clarksburg, Harrison County, W. Va., or such other place or places as the partners should thereafter determine, and which written contract contained the following provision: "That each of them, the said A. G. Smith, John W. Brown, and B. H. Brown, will diligently employ himself in the business of the said partnership, and be faithful to the other of them in all transactions relating to the same." The contract was, however, only signed by two of the partners, viz. A. G. Smith and J. W. Brown. Under this partnership, the firm commenced business early in the year 1871 at Clarksburg, and continued until this suit was brought by A. G. Smith, in December, 1894, in the circuit court of Harrison county, for the purpose of dissolving the partnership and winding up the affairs of the firm.

Plaintiff alleges in his bill: That ever since February, 1871, the firm of Smith, Brown & Co. has been transacting a retail merchandise business, and has also engaged in some side transactions in wool and real estate. That the parties contributed twelve thousand three hundred dollars to start the business, each paying in an equal amount, and invested a part of their capital in the purchase of an undivided half of a house and lot on Main street, in said town of Clarksburg, from one R. N. Pool. That the firm entered into a contract with Pool that he (Pool) should have the use of one-half of the second floor of said building, and the rents of the third floor or story, and the firm was to have the first floor of said building, consisting of two rooms and one-half of the second floor, free of rent for one year from the time said rooms should be finished and occupied by the firm (the rooms then being unfinished), and after the first year the firm was to have the two rooms on the first floor, and one-half the second floor, which also contained two rooms, at an annual rent, which was proportional to the rental of the whole building, which latter was to be upon the basis of six per cent. on the entire cost of the building and lot, which was about fifteen thousand dollars. That the upper or third story consisted of a hall or large room, which was used as a public hall for lectures,

theatrical performances, etc. That on May 8, 1874, complainant purchased for his wife, with funds of her separate estate, the undivided moiety so held by Pool, and which was conveyed to her, and she thus became entitled to the rental of said moiety. That Anna, his wife, died June, 1886, leaving, surviving her, the plaintiff, her husband, and Henry R. and Gertrude Smith, her two children. That on the 4th day of August, 1887, the building was destroyed by fire. That so much of the stock of goods as was not destroyed by the said fire was removed to another room rented about eight months for the purpose, until plaintiff completed a building on the part of their lot, which, by partition between the firm and said plaintiff and two children, was set apart to the latter. That with said children's money plaintiff erected the building on the children's lot at a cost of seven thousand two hundred and seventy-two dollars. That, as the firm was paying rent for the room so occupied after the fire, plaintiff suggested that the firm occupy the new building put up by him as their place of business, and that a rental should be paid by the firm equal to six per cent. upon the cost of the building and value of lot, with the taxes and insurance thereon, which, upon said basis, would be at least six hundred dollars per year. That on the 7th day of June, 1888, the firm moved into and occupied the building upon the understanding that such rental should be paid, and has ever since continued to so occupy it, but no part of such rent has ever been paid. Further alleging that during the continuance of said partnership, up to the time of filing his bill, no profits had ever been divided between the partners, but that each had drawn or taken from the store the following amounts or sums, principally in merchandise, as shown by the books of the firm, up to July 31, 1894; that is to say, plaintiff is charged with twenty thousand four hundred and sixty-five dollars and twenty-eight cents, John W. Brown with nineteen thousand eight hundred and eighty-nine dollars and twenty-nine cents, and Beeson H. Brown with eight thousand seven hundred and ninety-three dollars and eight cents,—making a total thus drawn of forty-nine thousand one hundred and forty-seven dollars and sixty-five cents. That, by a subsequent arrange-

ment, B. H. Brown was to be made equal to the one-third of said aggregate, or rather was to be paid the difference between sixteen thousand three hundred and eighty-two dollars and fifty-three cents and eight thousand seven hundred and ninety-three dollars and eight cents out of a transaction or speculation in some coal land consummated in the latter part of the year 1893, and which said B. H. Brown had actually retained in such manner. That the mercantile business, from the inception thereof to the institution of this suit, had in the main been unprofitable. That by said fire their interest in the building was destroyed in August, 1887, together with quite a large stock of wool which they had on hand in the building, and, having no insurance on building or wool, were a total loss to the firm. That, during the existence of said firm, plaintiff had from time to time, at the request of the Browns, loaned and advanced money to the firm to assist in carrying on its business, as follows: August 11, 1884, one thousand three hundred and sixteen dollars and seventy-one cents ; July 10, 1885, three hundred and fifteen dollars and thirty-five cents ; July 23, 1885, three hundred dollars; May 10, 1886, one hundred and thirty-nine dollars and twenty-two cents ; July 21, 1887, two hundred and fifty-six dollars ; March 3, 1892, three hundred and eighteen dollars and eighty-four cents,—for all of which sums plaintiff holds the notes of the firm, and the same are unpaid, except the first of said loans is subject to the following credits : June 5, 1886, one hundred dollars; July 10, 1886, three hundred hollars; July 5, 1887, one hundred and ten dollars. That he also owns a note of the firm of August 7, 1892, for seven hundred and twenty-six dollars and thirty-eight cents, for money borrowed from Mrs. Beebower, and assigned by her to plaintiff. That in the year 1871 the firm bought a large quantity of wool on commission, on which it realized a large profit, of not less, as plaintiff believed, than three thousand dollars, and possibly as much as four thousand dollars, all of which was received by B. H. Brown, or by him and John W. Brown, and no part of which had ever been paid to plaintiff or in any way accounted for to plaintiff. That, during the existence of such partnership, he and his partners had en-

gaged in some speculations in coal lands, which had real-
ized considerable profits.   That in the fall of 1893 they
engaged in one of said speculations in some coal lands ly-
ing in the vicinity of the village of Sardis, from which
about fourteen thousand dollars was realized, and from the
profits of said transaction said Beeson H. Brown was to
receive credit for the difference between sixteen thousand
three hundred and eighty-two dollars and fifty-three cents
and eight thousand seven hundred and ninety-three dol-
lars and eight cents, and the residue of the said profits
was then to be equally divided between the three partners,
but that plaintiff had received no part thereof; alleging
that there were outstanding debts or claims against the
partnership in addition to those of plaintiff for money ad-
vanced and for rent of building, but could not state to
whom owing, or whether all such claims and debts were
valid.   That for the last four years the mercantile busi-
ness had been conducted at a loss, and the income or re-
ceipts of the business had not actually paid the expenses
including the rent of building.   That the relations of plain-
tiff and his said partners, especially with Beeson H.
Brown, were such that it was very unpleasant for him to
give any attention to the business, even if it were neces-
sary; and that, in fact, the firm was doing so little busi-
ness in a mercantile way that the storeroom simply fur-
nished the members of the firm a loafing place, rather than
a place where they conducted any business; and that
plaintiff's interests, at least, would be better subserved by
a dissolution of the partnership, the winding up of its busi-
ness, and distribution of its assets.   That the period
agreed upon for the existence of the partnership was five
years from August, 1870.   That, since the expiration of
the time, plaintiff had frequently requested the Browns to
make settlement with him of the affairs of the firm, wind
up its business, settle its debts and liabilities, and pay to
each member of the firm whatever might be owing to him
upon such settlement; but his repeated requests had been
refused by both said J. W. Brown and B. H. Brown, and
plaintiff was compelled to resort to a court of equity to
compel a settlement of the affairs of said partnership.
That the assets of said firm consisted of the moiety of said

lot of land on Main street, in the town of Clarksburg, assigned to the firm in the partition decree of February 1, 1888; of about three hundred acres of coal land, being an undivided interest in a large body of coal land on the waters of Ten Mile creek and Limestone creek, in Harrison county, acquired by the parties in a coal transaction in the year 1891; of a stock of goods and merchandise in the building so occupied by the firm, of uncertain value, consisting of goods somewhat out of style, and somewhat damaged, not worth probably from four to five thousand dollars; of a small amount of debts due to the firm, but which plaintiff believed to be worthless. That plaintiff was advised that he had a right to go into a court of equity, and compel a dissolution of said partnership, and the sale and distribution of its assets after a full settlement of accounts between plaintiff and his partners; and praying that said Browns be made parties, and be required to answer fully, etc. That the case be referred to a master to settle and state the accounts between the co-partners, as well as for the purpose of ascertaining what assets belong to the firm, what disposition shall be made thereof as between them, and that inasmuch as the business of the firm was paying nothing, and the expenses of conducting the same were in excess of the profits, a receiver be appointed at once to take charge of said stock of goods, and sell the same at auction, or in such other manner as might be deemed best; and that the possession of said storeroom occupied by the firm be delivered to plaintiff, as guardian of his children, etc.

Beeson H. Brown filed his demurrer and answer, avering that it was understood and agreed among the members of soid firm that the firm would purchase the second moiety of the property for the firm whenever it could be secured at "a low-ebb price," and that plaintiff acted in bad faith, and purchased said moiety for a nominal sum of $———, and, in violation of said agreement and understanding, had the same fraudulently conveyed to others, instead of to the firm which was entitled to it; that he knew nothing of the separate estate of plaintiff's wife, Anna M. Smith, nor of the purchase of said moiety for or by her, and did not admit such purchase or any agreement with her

as to the payment of the rent to her therefor, admitted the death of said Anna, but denied that she ever demanded rent in her lifetime; that the right of the same at her death passed to her personal representatives, who alone could demand and sue for the recovery of the same, and plead the statute of limitations against such claim for rent made either by the personal representatives of said Anna, the plaintiff, or any other person for payment thereof, more than five years having elapse since the right of action therefor accrued, and also against any other pretended rents thereafter so barred; averring as true, but not alleged in the bill, that at the time of the fire, in August, 1887, the firm was largely indebted to sundry persons, and possessing assets rendered by said fire grossly inadequate for the payment of their indebtedness; that the firm executed a deed of August 4, 1887, conveying all its assets to M. G. Holmes in trust, to secure its creditors, which trust deed was duly recorded, and a copy exhibited with answer; that from that time forth the weight of the firm business had fallen almost entirely upon respondent; that the other parties had given very little attention to, and manifested very little interest or concern, in the firm's business, further than merely to assent to its management, and approve of its conduct by respondent; that, soon after executing said deed of trust, an arrangement was made and agreement entered into between the trustee, the members of the firm, and the creditors, by writing entered of record, by which the trust was suspended five years, and exhibited said writing with answer; that part of the debts secured by the trust have not been paid, and said trust not released, and still in force. Respondent admits that plaintiff erected and completed a new building, but alleges that it was done under an agreement that he should use all the available material from the ruins of the old building, together with so much of the firm's merchandise as could be used in the payment of workmen, and was used to the value of $—— in the construction of said building, and five thousand dollars was to be expended by plaintiff in the erection thereof, and all of which building and moiety of lot on which it was erected was to be conveyed to the firm of Smith, Brown & Co., and said company was to repay said Smith

the said five thousand dollars, with its interest, and convey the other moiety of said lot to him and his said children at the expiration of five years or soon thereafter, which building was to be occupied in the meantime by said firm free of rent; but in case the firm failed, for want of money or otherwise, to carry out its part of the contract, then said firm was to pay Smith as rent six per cent. of the investment on said five thousand dollars; but that the firm has always been ready to carry out its contract; that said building has ever since been used and occupied as its place of business, but at the expiration of said time, and on the demand of said firm, said Smith refused, and still refuses, to convey said property to the firm in further pursuance of said contract, and up to the time of bringing this suit had not presented any bill for rent, nor had any been paid for the building. And respondent claimed that the firm had the right to have said contract specifically enforced. Respondent denied that there was such a proposal as that the firm should occupy the building, and pay as rental six per cent. on the cost of building and lot, with taxes and insurance; alleging that no partnership profits had been divided between the members since the settlement in 1874, but that each had drawn from the store, principally in merchandise, as shown by the books of the firm, as follows: Plaintiff, up to January 7, 1895, nineteen thousand seven hundred and thirty-eight dollars and fifty-seven cents (instead of twenty thousand four hundred and sixty-five dollars and twenty-eight cents, as alleged in the bill), John W. Brown, nineteen thousand nine hundred and ninety-seven dollars and fifty-two cents; and respondent, eight thousand seven hundred and ninety-three dollars and eight cents,—making a total of forty-eight thousand five hundred and twenty-nine dollars and seventeen cents, instead of forty-nine thousand one hundred and forty-seven dollars and sixty-five cents, as alleged in the bill; that the partners had agreed to charge themselves, for goods taken out of the store, with the cost thereof, and twenty-five per cent added thereto; that respondent had adhered to said agreement, while his partners had generally charged themselves with the cost only, or with the cost and ten per cent. added; and prayed that the several accounts of the part-

ners should be modified accordingly; and that interest should be charged to the members on their yearly balance since the settlement in 1874, up to date. Respondent denied that his account was to be made equal to the others out of the profits of a transaction or speculation in coal lands consummated in the latter part of 1893, and that he had so retained the amount; denied the firm's transactions in wool; denied that the firm engaged in speculations in coal lands near Sardis, or that the firm had any interest in it, but that it was respondent's individual enterprise; and charged that plaintiff was likewise engaged in individual coal ventures, house building, cattle business, and various other kinds of business mentioned, the profits of which he claimed for himself, and from which plaintiff's loans to the firm, as claimed in the bill, were raised; that respondent's only object in holding the firm together was to get it out of debt, and in condition for an honorable settlement among themselves, that respondent might get his just dues for the long indulgence he had given them on their indebtedness to him; that there had been no serious frictions, etc.; denied that the assets were in peril, or that sufficient reason existed for the appointment of a receiver, and that the trustee, M. G. Holmes, had full power to act. Respondent claimed that he was entitled to be, and should be, paid for his services in the management and conduct of the firm's business after the fire, at least fifty dollars per month; alleged that the assets consisted of the firm's interest in the real estate in Clarksburg, including the building thereon, subject to the money plaintiff invested therein under the agreement, the stock of goods therein, worth probably three thousand five hundred dollars to four thousand five hundred dollars, including accounts, fixtures, etc., and the note for seven thousand two hundred and eighty dollars, held by the firm against respondent; and denied that the firm held three hundred acres of coal in the "Hogsett" field, as alleged; but averred that each member of the firm held one hundred acres therein, as shown by the deeds.

The defendant John W. Brown also filed his demurrer and answer; admitted the partnership and the purchase of the moiety of the property by the firm, but denied the

purchase of the Pool interest by plaintiff with his wife's money; admitted that, if the purchase of the Pool interest and its conveyance were regular, the wife would be entitled to the rents from the date of conveyance, April 25, 1879, to the time of her death, June 11, 1886, but denied that from that time until August 4, 1887 (the date of its destruction by fire), plaintiff, as tenant by the curtesy, and not his children, would be entitled to the rents; admitted that the firm moved into the new building June 8, 1888, and ever since remained in possession, but denied that it went in with the understanding of paying rental as alleged; alleged that no bill for rent had been presented, he supposed for the reason that the agreement between plaintiff and B. H. Brown was being carried out in good faith; denied that the firm in 1871 bought a large quantity of wool, from which a profit of three or four thousand dollars was realized; averring that B. H. Brown had been prior to the organization engaged in the wool business in Ohio and West Virginia, and the firm agreed that, if he would bring his separate wool business to their store, giving them the benefit of any exchange he made for wool, he could retain the commissions as his individual profit, which arrangement was carried out until the early fall of the year, when, by agreement, the firm went into the wool business by buying and selling wool direct, which became their principal business, and was profitable up to the time of the fire; averring that August 12, 1874, there was a full settlement of all accounts and claims of each member, including rents on the Pool-Miller moiety of the building, which then belonged to plaintiff; each individual account was then "squared with the other members' accounts," and it was distinctly understood that the wool transactions up to the early fall of 1871 were personal to said B. H. Brown; that no claim was made on him for any interest therein in the settlement of 1874. Respondent admitted that the members of the firm engaged in two coal speculations, not in the firm name, but through the individual options and deeds to him of co-defendant B. H. Brown, and from which they realized large profits,—one near Wolf Summit, known as the "Hogsett Field," the other known as "Katylick Field," on Limestone and Ten Mile creek;

the profits arising therefrom were, by mutual consent of members of the firm, set aside for the payment of firm debts as far as was necessary; denied that the firm had any interest in the "Sardis Field," but averred that it was an individual venture of B. H. Brown. Respondent set up claim to one undivided third part of the surface of two hundred and twelve acres of land purchased from Dr. J. L. Carr, which went into the Katylick field, which was a deal for the benefit of the firm. Respondent averred that if the firm had dissolved and wound up its business after the fire, and after executing the trust to Holmes, as plaintiff proposed to do, its goods would have been sold at a sacrifice, and it would have been left hopelessly insolvent for twenty thousand dollars or more; denied that plaintiff's bill properly states the assets of the firm; that it really consists of the stock of goods, of certain debts, and of an interest in the lot and the building thereon, originally purchased by it in Clarksburg; also the note of B. H. Brown; that the three hundred acres of coal land is not in fact coal land, but "coal with accompanying mining rights and surface privileges," part of the Hogsett field, and held by the parties to this suit in their individual names. Respondent denied that the old store building in Clarksburg, of which the firm owned one moiety, and Pool the other, cost fifteen thousand dollars in whole or by moieties, or any sum near that amount; and averred that by the settlement of 1874, when plaintiff owned the Pool moiety, the rent upon that moiety was therein, by plaintiff's consent, stated at two hundred and fifty dollars per annum. Respondent alleged that whatever rent plaintiff may have been entitled to, if anything, upon the Pool moiety, from May 8, 1874, the date of Miller's deed to him, to the date of his conveyance to Turner, April 24, 1897, and whatever rent, if anything, was due to said Anna M. Smith upon said Pool moiety from the date of Turner's deed to her, April 25, 1879, up to the date of her death, June 11, 1886, and whatever rent, if any, was due upon the Pool moiety from the date last aforesaid to the date of the fire, August 4, 1837, having become due and payable, if payable at all, more than five years before the institution of this suit, is barred by the statute of limitations, which respondent

pleads to said amount, and to each and every part thereof. The separate answer being filed, the plaintiff replied generally thereto.

On the 4th day of November, 1894, notice was served on the defendants by plaintiff that on the 10th day of December, 1894, he would move the judge of the circuit court to refer said cause to a commissioner, for the purpose of ascertaining and reporting the matters prayed to be referred in the bill filed in this cause, and also for the appointment of a receiver to take charge, sell, and dispose of the stock of goods and merchandise belonging to the firm of Smith Brown & Co., in the building situated on Main street, in the town of Clarksburg, on which 10th day of December, 1894, on hearing the motion, the judge referred the cause, by consent of parties, to E. M. Turner, as special commissioner, to state and settle the accounts between the plaintiff and defendants as partners, trading under the firm name of Smith, Brown & Co., as to all transaction or business, of whatever nature, in which they have been engaged as such firm, to state and settle the debts and liabilities of said firm so far as they can be ascertained, as well as the amount of assets belonging to said firm, and what disposition should be made of the same, together with any other matters such commissioner may deem pertinent, etc. and, by consent, the motion to appoint a receiver was continued until the next regular term of the court. September 23, 1895, the defendants filed exceptions to the report of Special Commissioner Turner, which had been filed September 11, 1895; and the court, having heard and considered the motion to appoint a receiver in the cause, the arguments of counsel thereon, the bill and answers and the depositions filed with the report, appointed Mathew G. Holmes special receiver in the cause, and on the 29th day of January, 1896, the plaintiff filed an exception to the report of Special Commissioner Turner, on the ground that the commissioner erred in allowing plaintiff rent upon the new building from October 26, 1889, instead of from the 7th day of June, 1888, which exception the Court sustained. The exception of defendant John W. Brown to so much of the report as ascertains and finds that John W. Brown is not entitled to one-third interest in

the surface of the J. L. Carr tract of land was sustained, and so much of said report as ascertains or finds that there is a liability or debt upon the firm of Smith, Brown & Co. for rent for any part of the period from April 26, 1879, to June 11, 1886, in favor of plaintiff, as administrator of Anna M. Smith, deceased, was erroneous; and the exception to said report upon said account was sustained, and all the other exceptions of the defendants, and each of them, to said report, were overruled, and the report confirmed, except as to the matters wherein the same was overruled and corrected as before stated. Thereupon the cause was heard upon the papers theretofore read, former orders and decrees therein, and upon said report of Special Commissioner Turner, and the depositions returned with said report, and the arguments of counsel. And the said special commissioner having submitted to the court the question as to whether the profits arising from what is termed in said report and the papers in the case the "Sardis Coal Deal" belonged to the plaintiff and the defendants as partners, and should have been divided as such, the court held that it was a partnership transaction between the plaintiff and defendants, and that the plaintiff and each of the defendants is entitled to one-third of the profits arising therefrom. And the court recommitted the cause to C. W. Lynch, one of the commissioners of the court, to ascertain and report the amount of profits derived from the sale of said "Sardis Coal Field," and the sum or amount which each of the parties would be entitled to receive therefrom; and to report, upon the basis fixed by said Special Commissioner Turner, the additional amount of rent to which the plaintiff would be entitled for the new building from January 7, 1886, to October 26, 1889, and interest thereon; also, to ascertain the value of the surface of said Carr tract of land; and to restate the individual accounts of the plaintiff and defendants as partners, so far as the same may be affected, or so far as it may be made necessary to do so by reason of additional items that may be found in favor of any of the parties arising from rent of said new building and from the profits of said Sardis coal deal or other items; and to report any other pertinent matter, etc.

From this decree, the defendants appeal to this Court,

and assign the following errors: "First. The court erred in overruling the exceptions of your petitioners to said report of said Special Commissioner E. M. Turner, and in refusing to sustain said exceptions or either of them, except the exception of your petitioner John W. Brown relating to the finding of the said commissioner in respect to the Carr farm, and the exceptions of your petitioners to the finding of the said commissioner as to the liability of the firm of Smith, Brown and Co. for rent from April 27, 1879, to June 11, 1886, in favor of the plaintiff, as the administrator of his deceased wife, Anna M. Smith. Second. The court erred in holding by its said decree that what is known as the "Sardis Coal Field" was a partnership transaction, and that the plaintiff and your petitioners were each entitled to one-third of the profits thereof. The weight of the evidence, if the testimony in said cause is to be believed, serves that said transaction was the individual enterprise of your petitioner Beeson H. Brown, and not a partnership transaction of the firm of Smith, Brown & Co. Third. The court erred in holding the findings of said commissioner correct, charging the said firm with rent for the 'new building' on a basis of 6 per cent. on more than five thousand dollars, its cost, added to the sum of nine hundred and fifty dollars, the cost of the lot on which it was erected. Fourth. The court erred by its decree confirming said report, and thereby holding that your said petitioners were not entitled to have the contract of the firm of Smith, Brown & Co. with A. G. Smith, for the purchase and conveyance of the new building and the lot on which it was erected, specifically enforced. Fifth. The court erred by its decree confirming said report, and thereby upholding the findings of said commissioner in relation to the Pool building that the sum of $3,525.95 should be added to the sum of $950, the cost of the lot on which it was erected. Sixth. The court erred by its said degree confirming said report, and thereby holding the firm of Smith, Brown & Co. liable to the said plaintiff for a larger amount of rent than was agreed upon,— i. e. two hundred doldollars per annum,—as is shown by the evidence before said commissioner said firm was to pay for the rent of the

Pool building exclusive of the hall. Seventh. The court erred in not finding and decreeing that the rents for the Pool building, or a part of them, accruing after the death of said Anna M. Smith, were barred by the statute of limitation, and thereby thus far overruling said report. Eighth. The court erred in sustaining the exception of the plaintiff to the report of said commissioner in relation to the rent of the new building from June 7, 1888, instead of from October 26, 1889. Ninth. The court erred in appointing a receiver for said firm, when the proof showed said firm was solvent, and no special cause or reason was shown for his appointment. Tenth. The court erred in its said decree in sustaining said report, and estimating the cost of the Pool building to be $14,159.71, instead of $10,294.43, as the amount on which the rental of 6 per cent. interest is to be paid by the said firm should the court hold the $200 entry and agreement is to be disregarded. Eleventh. The court erred in its said decree in sustaining said report, and disregarding the agreement between the partners of said firm that 25 per cent. profit should be added to the cost price of all merchandise taken by them out of their store, and so charged in the account of each with said firm. Twelfth. The court erred in its said decree in sustaining said report, and not deducting 15 per cent. from the account of B. H. Brown, that being the overcharge against him in favor of said firm in its account against him. Thirteenth. The court erred in its said decree in sustaining said report, and not allowing petitioner B. H. Brown the salary claimed by him in his answer in said cause, under the circumstances therein set up. Fourteenth. The court erred in sustaining said report, and so much thereof as is based upon the paper writing of August, 1870, signed by A. G. Smith and J. W. Brown, but not by B. H. Brown."

The most of the assignments can be considered with and as part of the first assignment of error, which is sufficiently general to cover all except the second, which relates to the "Sardis Coal Deal," the questions arising out of which the commissioner submitted to the court without recommendation. Defendant John W. Brown excepts to the report, because it is without date, and hence it cannot

be ascertained whether he retained it after its completion ten days for examination by the parties and their attorneys, and that it does not appear that it was so held by the commissioner ten days, the same not having been otherwise ordered by the court or agreed to by the parties. It appears from the record that the cause was referrd to E. M. Turner, as special commissioner, "by consent of parties by counsel," to "state and settle the accounts between the complainant and defendants as partners," etc., although said Turner was a resident of another county. On completing the report, the commissioner says: "This report was placed in the office of the clerk of the circuit court of this county on the 1st day of September, 1895, for the inspection of the parties, and they were so notified. It has remained there ten days, according to law." The report was placed where it would be most convenient to the parties in interest. I take it that none of the parties ever expected the commissioner, who is a citizen of Morgantown, in another county, to take the report with him, and hold it ten days in his own hands; but he did the most reasonable thing he could with the report,—placed it in the office of the clerk of the court in which the cause was pending, where all parties had access to it, and were notified of the place of its deposit. The record shows that the report was filed by the clerk on the 11th of September, 1895; and the said J. W. Brown excepts, because he says that the 1st day of September, the day on which it was left in the clerk's office for inspection, and the parties notified of the fact, was Sunday, which being *dies non,* it was not lawful to complete or sign it on that day, and that ten days did not elapse from Monday, the 2d day of September, to the 11th, when the same was filed in the clerk's office, and that the time could only be computed from the 2d day of the month. The report was evidently completed and signed before the 1st day of September, as it shows that the evidence was completed on the 9th day of August, and that from that time the commissioner was engaged in making up his report at his home, in Morgantown, and that the report was placed in the clerk's office of Harrison circuit court on the first day of September, 1895. It appears from the record that the defendants filed exceptions

to the report within the time before its filing in the clerk's office, on the 11th of September, and asked leave, before the submission of the cause during the term of court which commenced on the 12th of September, to file other and more specific exceptions to the same, which they were permitted to do, and did do, not only during the September term, but at the following January term, 1896. The defendants, having filed exceptions before the report was filed in the clerk's office, and asked leave to file other exceptions during the September term before the submission of the cause, must be held to have waived their right to except because the report was not held full ten days before filing; and the defendants, having afterwards, before the hearing, which did not take place until the second term after the filing of the report, filed many and elaborate exceptions, and having all the time and opportunity their interests could require, have no cause of complaint in that regard.

On the 6th of August, 1870, the firm of Smith, Brown & Co. purchased from R. N. Pool the one undivided half of a lot with the building thereon, which was in course of erection. The agreement for the purchase provided that the said Pool, in consideration of having the use of one-half of the second story or second floor and the proceeds of the rents of the third floor of the building, was to allow the firm to have the first floor or two business rooms, and also one-half of the second floor, free of any rent, for one year from the date said rooms should be furnished and occupied by the firm, and that, after the first year, they were to have the use of the same rooms at annual rent, bearing its proportion to the whole of the building, based on six per cent. of the whole cost of the building and lot, and that the firm should continue to occupy the rooms at the same rent or terms as long as the firm should remain one-half owner in said building. The cost of the building, including the lot, was thirteen thousand, five hundred and sixteen dollars and ninety-six cents, one-half of which was six thousand, seven hundred and fifty-eight dollars and forty-eight cents, and upon which last-named sum the rent was fixed at six per cent. and to so continue as long as the firm continued to own one-half the property; and defend-

ant B. H. Brown alleges in his answer that this agreement
of rent of the Pool half was a "money consideration for the
purchase of the first-named moiety, which contract it was
specifically agreed should be and continue in full force and
effect so long as said Smith, Brown & Co., should own the
moiety first aforesaid;" and this continued the agreement
between the firm and the owner of the Pool moiety, who-
ever he might be, first to Miller, the vendee of Pool, then
Miller's vendee, the plaintiff, unless a subsequent agree-
ment was made whereby the owner of the Pool moiety
agreed to take a different sum as rental.  On the part of
the appellants it is claimed that an arrangement was made
between them and the appellee whereby he was to receive
a less sum, viz., two hundred dollars per annum, for the
rent of said moiety.  J. W. Brown testifies that such agree-
ment or arrangement was made by and between all the par-
ties when present together.  Appellee denies it most posi-
tively; while defendant B. H. Brown testifies to nothing
from his recollection of the agreement, but only refers for
explanation to an entry made by appellee in the ledger,
giving himself credit for two hundred dollars "for one year
store rent of lower room," the words "of lower room," be-
ing interlined in the same handwriting.  The original entry,
as it appears on the blotter, as shown by Commissioner
Turner's report, is "for one year's rent," and on the jour-
nal "one year's store rent."  Appellee testifies that the
interlineation of the words "of lower room" was made at
the time of the original entry in the ledger.  The commis-
sioner, in view of all the evidence touching this point, and
in view of the fact that appellee paid Miller five thousand
five hundred dollars for the moiety, and of the recorded
contract to pay six per cent. upon the cost of the Pool
moiety, the benefit of which came to appellee by virtue of
the conveyance of Pool to Miller, and Miller to appellee,
holds that the evidence is not sufficient to establish a sub-
sequent contract or arrangement for a less rent to be re-
ceived by appellee; and I think he is right in his conclu-
sion.

Appellee, for the new building erected on one-half of the
lot after the fire and the partition, charges and is allowed
by the commissioner six per cent. interest as rental on

seven thousand three hundred and sixteen dollars and seventy-five cents, the actual cost of the new building, with three thousand dollars added for estimated value of the lot, to which B. H. Brown excepts, there being no evidence of the value of the lot being three thousand dollars except the estimate put upon it by the plaintiff. While it is admitted that the whole lot was purchased by Pool for one thousand nine hundred dollars, and prior to the fire the rental on the Pool moiety had been based on the actual cost of the property, including the half of the lot at nine hundred and fifty dollars, the actual cost thereof, while there is no clear proof as to what the contract was as to the terms of occupying the new building, the appellee alleging that he was to have six per cent. on the cost of the building and value of the lot, and the firm to pay the taxes and insurance, the appellant B. H. Brown denied such a contract, and, on the other hand, claimed a wholly different agreement, to wit, that appellee was to invest in the building five thousand dollars for his children, the firm was to occupy it five years, and at the end of that time the firm was to repay the five thousand dollars, with its interest, and have the lot conveyed to it, and it (the firm) was then to convey to appellee's children the other half of the lot, and, if the firm failed to repay the five thousand dollars and interest, then they would pay appellant six per cent. on the five thousand dollars for rent for the time they had occupied it. As this contract, if proven, could not be executed; as appellee could not make a valid contract to sell and convey his children's property in that way, but only by proceedings in and decree of the circuit court, as provided by statute; and as neither contract was clearly proved; and the appellee being fairly entitled to reasonable rent for the property so occupied; and six per cent. on the actual investment having been deemed a reasonable rental by the parties in the renting of the Pool interest (and the testimony of appellant shows it to be a fair rental); and B. H. Brown admitting that, in case the firm failed to repay the five thousand dollars with interest, then they should pay six per cent. on the amount invested in the building (five thousand dollars), it is pretty certain that it was understood that the rental should be

arrived at by finding six per cent. on some amount, and that amount, it is more than probable, the whole amount actually invested in the property; appellee showing the exact cost of the building to be seven thousand three hundred and sixteen dollars and seventy-five cents, which sum should be augmented by nine hundred and fifty dollars, the actual cost, and not by three thousand dollars the estimated value, of the lot on which the building was erected, making eight thousand two hundred and sixty-six dollars and seventy-five cents as the proper basis of rental at six per cent., and the taxes and insurance. The exception to the commissioner's report as to the difference between nine hundred and fifty dollars, the actual cost, and three thousand dollars, estimated value, of the lot, should have been sustained.

The exception to commissioner's report that the statute of limitations should operate and apply in favor of the heirs of Anna M. Smith as to the firm's share of the hall rent received by them, or by appellee for them, although such statute was not pleaded by appellee, because appellants had pleaded and were entitled thereby to the benefit of the statute of limitations against rents, is well taken. Before a party can have the benefit of the bar created by the statute of limitations, he must plead the statute, or in some manner indicate his intention to claim the benefit of it. *Riddle* v. *McGinnis*, 22 W. Va., 253, 275; *Seborn* v. *Beckwith*, 30 W. Va., 774, (5 S. E. 450). "It is generally held that the statute of limitations must be pleaded if it is relied on, and that, if not pleaded, it will be considered by the court to be waived." 13 Am. & Eng. Enc. Law, 769.

The seventh assignment is "that the court erred in not finding and decreeing that the rents for the Pool building, or a part of them accruing after the death of Anna M. Smith, were barred by the statute of limitations, and thereby thus far overruling said report." The appellee, after the death of said Anna, his wife, was tenant by the curtesy, and the rents were due to him on said property. "In order to subject an action of one partner against his copartner to the bar of the statute of limitations, it must not only appear that there has been a dissolution of the partnership more than five years before the institution of the

suit, but that there were no valid claims of debit or credit against or in favor of the firm paid or received or outstanding, within that time." *Sandy* v. *Randall,* 20 W. Va., 244.

The eighth assignment, that the court erred in sustaining the exception of the plaintiff, Smith, to the commissioner's report in relation to the rent of the "new building" from June 7, 1888, instead of from October 26, 1889, is not well taken. Appellee was tenant by the curtesy of the lot. He erected a building upon it, and the firm occupied the property from the 7th day of June, 1888, and a reasonable rent therefor was due to him from the firm. While it is true that it appears from the record that he erected the building with funds the property of his children, he is not dealing with the firm as guardian of his children, but as a partner in the firm; and the firm is liable to him only as an individual and partner, and not in his fiduciary capacity. If appellee was guardian of his children, no evidence of the fact appears in the record. He was improperly held as guardian by the commissioner in his report. In any event, he would be held to account on his bond as guardian, if he was such, for the funds which came to his hands in that capacity.

Defendants' exception to commissioner's report "because he allows compound interest on rent account" is not well taken, because the commissioner does not compound the interest. In ascertaining the rent for any given year, he simply computed the interest on the value fixed on the property as the basis of rent at six per cent. for the year. When so ascertained, it showed the amount of the year's rent. Then he allowed interest on that sum, not of interest but of rent, from the end of the rental year up to the date of making up his report, and so on each year's rental.

The evidence touching the eleventh assignment of error, that the court should not have sustained the commissioner's report in disregarding the agreement between the partners that twenty five per cent. profit should be added to the cost price of all merchandise taken by them out of the store, and charged in their respective accounts, is so conflicting and uncertain as to warrant the commissioner in so reporting, and the court in sustaining such report. *Smith* v. *Yoke,* 27 W. Va., 639.

And the same is true of the twelfth assignment, which asserts that the court erred in sustaining said report in not deducting fifteen per cent. from the account of defendant B. H. Brown, as overcharge against him in favor of the firm in its account against him.

The thirteenth assignment is that the court erred in not allowing defendant B. H. Brown the salary claimed by him in his answer, of fifty dollars per month for extra services. The evidence shows the defendant B. H. Brown gave more time, effort, and energy to the business of the firm, and was worth more to it, than both the other partners; and it is clearly shown that but for his pluck and energy after the fire, in August, 1887, the firm would have been and remained what its condition seemed to be when the smoke cleared away from the ruins of their plant,—hopelessly insolvent. Yet, in the absence of an agreement or contract providing for compensation for such services, it cannot be allowed. In *Forrer* v. *Forrer*, 29 Grat. 134, Syl., point 1: "The law is well settled that one partner is not entitled to claim compensation for his services in the business without a special contract for such compensation, and although one partner attended almost exclusively to a very large partnership business from 1844 to 1865, there having been no agreement for compensation to him, he is not, under the circumstances, entitled to compensation." Also, in *Hyre* v. *Lambert*, 37 W. Va., 26, (16 S. E. 446), Syl., point 5: "Under ordinary circumstances, and in the absence of an agreement to that effect, one partner cannot charge his co-partners with any sum for compensation, whether in the shape of salary, commission, or otherwise, on account of his own trouble in conducting the partnership business; and in this respect a managing or acting partner is in no different position from any other partner." In the case at bar, while it is strenuously contended that the claim for compensation to B. H. Brown for extra services should be allowed, there is no pretense that there was any agreement or understanding between the parties that he should have such compensation.

As to the assignment that the court erred in appointing a receiver, courts of equity are invested with discretionary powers, under our statute, "in any proper case pending

therein in which the property of a corporation, firm, or person is involved, and there is danger of the loss or misappropriation of the same, or a material part thereof," to appoint a receiver thereof. Code, c. 133, s. 28. "But no such receiver shall be appointed of any real estate, or of the rents, issues or profits thereof until reasonable notice of the application therefor has been given to the owner or tenant thereof." *Id.* "The discretionary power possessed by courts of equity of appointing receivers or refusing applications for such appointment will not be interfered with on appeal except in cases where the discretion has been manifestly abused; this being the general rule as to the appellate review of discretionary action." 5 Thomp. Corp. § 6823; *Weigand* v. *Supply Co.*, 28 S. E. 803. In case at bar, notice was given by plaintiff to defendants that on the 10th day of December, 1894, application would be made to the judge of the court for the appointment of a receiver in the cause, on which day, by consent of parties, by their counsel, the motion to appoint a receiver was continued to the next regular term of the court; and said motion was not heard until September 23, 1895, after the filing of the commissioner's report and the evidence taken in the cause, which were considered upon the hearing of the motion. The evidence disclosed an unfriendly feeling existing between the parties, so that they could not act in concert and harmony, which was necessary to the proper and successful conduct of the business of the firm. In view of this fact, and of all the evidence taken in the cause, I think the court exercised a sound discretion in appointing a receiver.

Let us now consider the action of the court in holding, by its decree, that the transaction known as the "Sardis Coal Deal" was a partnership transaction, and which is the appellants' second assignment of error. On the 11th of August, 1870, appellee and appellants entered into a written contract bearing that date, (which was only signed, however, by A. G. Smith and J. W. Brown), whereby they agreed to enter into a co-partnership in the business of "general merchandising," from the 11th day of August, 1870, for the term of five years next thence ensuing, under the firm name of Smith, Brown & Co.; the business to be

carried on at Clarksburg, Harrison County, W. Va., or
such other place or places as the partners should there-
after determine. The capital of the partnership was to
consist of twelve thousand five hundred dollars. Smith
put in a stock of goods at the price or agreed value of seven
thousand five hundred dollars. The Browns each put in
two thousand five hundred dollars in cash, and gave their
respective notes to Smith for one thousand six hundred
and sixty-six dollars and sixty-six cents, with interest at
six per cent. per annum, for the purpose of making the
parties all equal in capital, and in all profits arising from
the business of the said partnership of Smith, Brown &
Co. And it was further agreed "that each of them, the
said A. G. Smith, John W. Brown, and B. H. Brown, will
diligently employ himself in the business of the said part-
nership, and be faithful to the other of them in all trans-
actions relating to the same." The contract containing
the foregoing provisions was signed and sealed by A. G.
Smith and J. W. Brown only, but it appears from the rec-
ord that they carried on the business as provided in said
agreement, and the said B. H. Brown made his note for
one thousand six hundred and sixty-six dollars and sixty-
six cents to said Smith, and afterwards paid it. The con-
tract was left with Smith, and it is claimed by appellants,
as shown in the testimony taken in the cause, that the word
"matters" was written in the sentence last above quoted
in the original contract, and that the said word was chang-
ed afterwards by the word "transactions" being written
over it in said contract. Appellee, in his testimony, says
that he wrote the entire paper, and he supposes the word
"transactions" was written in at the time the paper was
written, and "it looks like the word might have been 'mat-
ters' instead of the word 'transactions,' but cannot say
positively about that;" says that he supposes the only rea-
son for changing the word was that the word "transac-
tions" seemed to sound a little better than the word "mat-
ters," and that he knew he never made any change in the
paper after it was signed. So that, according to the testi-
mony of the appellee, the word "transactions" is only en-
titled to the same meaning and legal significance in the
contract that the word "matters" would have had if the

latter had been permitted to remain, whatever the difference may be in the legal meaning of the two words.

It appears from the evidence in the cause that the partners individually carried on business for themselves, respectively, during much of the time of the existence of the partnership, especially after the fire in August, 1887. Soon after that occurrence, J. W. Brown left for the West, and did not return until the next year. Appellee, Smith, built the new house, commencing about October, 1887, and finishing it so that the firm entered it June 8, 1888. J. W. Brown testifies that B. H. Brown was to take charge of the stock of goods, and do the best he could with them towards paying the firm's indebtedness, and, as for himself, he began at once to make a living outside of the firm's business, realizing that, if the debts of the firm were to be paid, the firm's assets would all have to go in that direction, so far as the goods were concerned; that, for about a year after they went into the new building, all three of the partners gave the business of the firm considerable attention; that after that, so far as he could learn from Smith's talk, he was looking after the building of some houses at his home in Preston county, some other houses at Fairmont, and other outside business, and B. H. Brown, except the year referred to, had entire charge of the business. It appears from the evidence that both B. H. Brown and appellee, Smith, were pretty actively engaged in taking options on coal lands in their individual names, respectively; that two "coal deals," known as the "Hogsett" and "Katylick" coal fields, were entered into by the firm and Col. Wilson, who had an interest in the same; that said deals were consummated, and sales made, and the firm's part of the profits applied to the payment of the firm's debts; that B. H. Brown, on his own account, took options on several tracts of coal land which constituted what is known as the "Sardis Coal Deal." The options constituting that deal were from forty to fifty tracts; all options taken in the name of B. H. Brown. Appellee charges in his bill that this coal deal was to be consummated for the benefit of the firm; that a sufficient part of the profits, which were about fourteen thousand dollars, was to be kept or retained by B. H. Brown, to equalize his account in the store with the other partners;

and that the residue of the profits was to be equally divided, after paying expenses, between the partners. B. H. Brown, in his answer, as well as his testimony, denies this in the most positive manner, but claims that it was his own deal, in which the other partners had no interest whatever. In this claim he is supported by the other partner, J. W. Brown, who says B. H. Brown had this coal deal well under way before he knew he had such options; that, as far as he knew, the firm were never consulted, nor aided in making the deal; that during the deal, when he thought there was a prospect of his making it, he offered his assistance to B. H. Brown in closing it up, when B. H. Brown told him that he did not see that he could help any, as he had 'Squire Plant employed to look after all the legal matters; that he and appellee, Smith, had talked over the matter a number of times, each expressing the hope that B. H. Brown would divide with them, though both recognized the fact that there was no hope of anything for them from a legal standpoint, as the entire transaction, from beginning to end, had been kept from him, and he gathered from appellee's talk that he had been treated in the same way. J. W. Brown further states that on one occasion "Kel Long and Douglas, who assisted in selling the Katylick field, were here to look after some more coal. * * * The next day they went down to Lumberport, to look at a tract that James Horner had under option. It was after this last trip B. H. Brown remarked to A. G. Smith, 'Why did you not show them my Sardis field?' Smith replied, in a sneering way, 'Nobody wants to buy that field; it is too far from the railroad.' " Appellee, Smith, admits in his testimony that all the expenses attending the taking of the options in the Sardis coal field, including notary's fees, taking acknowledgments of deeds, surveys, etc., were paid by B. H. Brown individually. James M. Plant testifies that he was employed by B. H. Brown to take the options on the Marshville end of the Sardis coal field; that Brown took a portion of the options himself, and afterwards had Plant to go and take the options on the remainder; that the portion of the field known as the Flag Run and Isaacs Creek end had been optioned by a firm by the name of Moore & Robey; that B. H. Brown came to his house, and they went over to

Moore & Robey's, and Brown negotiated with them, and bought their options on two thousand acres of coal land, and was to give them three thousand dollars as commission for their work; that Mr. Brown employed him on the survey, and paid him for his work, and that the whole transaction, so far as he could see, was that of B. H. Brown; that he knew of no other person interested in the field as a purchaser or as taking options except said Brown, and did not remember that Mr. Smith or J. W. Brown made· any claim to the field; that he frequently saw Smith and J. W. Brown, but neither of them ever claimed that they had any interest in it. Witness Charles A. Boggess, surveyor, of Clarksburg, states that he surveyed what is known as the "Sardis Coal Field" in the summer of 1893; was employed by B. H. Brown in the neighborhood of three months in the field and in the office; may have been longer; he prepared all the deeds conveying the farms going to make up the Sardis coal field; was paid by B. H. Brown by his checks; that his business was all with Brown, and he did not know of any one else being interested in it; believes that his bill was a little less than three hundred dollars; that amount did not include anything for chain carrier; thinks they were paid a dollar a day and their expenses; two chain carriers, a flagman, and axman were employed.

As against the positive evidence of B. H. Brown and J. W. Brown, two of the partners, strongly supported by the evidence of J. M. Plant and C. A. Boggess that the Sardis coal deal was a private transaction of B. H. Brown, and that neither of the other partners had any interest in it, appellee gives his own testimony contradicting it, and the testimony of several witnesses to certain conversations had with B. H. Brown tending to show that he admitted the interest of the other partners in the transaction, and also introduced three letters written by said B. H. Brown to said Smith, when Smith was at Uniontown, for the purpose of negotiating the sale of the Katylick and Hogsett fields. It is argued by appellee that these letters strongly tend to prove appellee's position in the matter, that the Sardis deal was not only a partnership enterprise, but that B. H. Brown himself so regarded it at that time. I have

examined these letters very critically, and find nothing in them inconsistent with the theory that the enterprise was regarded by Brown as purely an individual transaction of his own, but entirely consistent therewith. The letters are open and frank, and do not read like the writer is endeavoring to conceal or guard anything, but writes just as he would if he supposed that the addressee was fully aware of his claim that it was his own enterprise. Smith was at Uniontown, trying to negotiate a sale of some coal property belonging to the firm which they were very anxious to sell. Brown wrote him that, if he could not sell the east Katylick coal field of eight hundred acres, to offer the Sardis field, thereby evincing an interest in the sale of his own as a secondary matter to the sale of the property of the firm; that, if Smith could not sell the firm property to the person with whom he was negotiating, he might be able to do something in the way of selling his Sardis interest. It is true that, on the consummation of the sale of the Sardis field by B. H. Brown, the firm loaned him notes belonging to the firm to the amount of seven thousand two hundred and eighty dollars, for which he gave his note to the firm, and which notes he used in payment to the owners for the lands or the coal interests sold; but said Brown was in a position where he could very well ask this accommodation from the firm, and they were in no position to decline his request, as it appears from the record that the firm was indebted to him in a much larger amount than the amount of the notes borrowed. Several conversations are proved with different witnesses tending to prove that the Sardis coal deal was a partnership enterprise. These conversations were had principally with persons who had given options on their land to B. H. Brown, and a very lame attempt is made on the part of appellee to impeach the testimony of defendant B. H. Brown. The witnesses examined on this point are persons with whom he had coal deals, or upon whose lands he had taken options, and the most of whom evince considerable feeling against Brown, and evidently base their opinions upon transactions they had had with him personally. No attempt was made for such impeachment by any witnesses who are acquainted with him in the community where he lives.

Taking together all the testimony on this point in the cause, with the fact that Smith and B. H. Brown were each taking options on coal lands in his own name, and independently of the firm, and that the other partner, John W. Brown, was likewise working on his own account, and the further fact, as appears from the record, that Smith was engaged in various other pursuits and industries on his own account, and all this with at least the tacit consent —certainly with the acquiescence—of the firm, and the coal transactions being outside of the partnership business, except the two particular transactions of the Katylick and Hogsett deals, which alone were handled for the benefit of the firm, the preponderance of the testimony in the case is decidedly with the defendant B. H. Brown in the matter of the Sardis coal deal, and should have been so held by the circuit court. For the reasons herein given, I am of the opinion that the decree complained of is erroneous. Therefore the same must be reversed, and the cause remanded to the circuit court for further proceedings to be had therein, according to the principles herein settled.

*Reversed.*