# CHARLESTON

## Sult v. A. Hochstetter Oil Company.

Submitted June 13, 1907.    Decided January 14, 1908.

1. Equity—*Bill—Multifariousness.*

   Whether a bill in equity is multifarious often depends on the particular circumstances of the case, rather than upon any fixed rule of procedure; and when the subject-matter is single and all the parties directly interested in it, the objection for multifariousness will be overruled, though the bill asserts two or more grounds of relief and tends to raise two or more issues, affecting the parties in divers ways. (p. 321.)

2. Same—*Pleading—Documentary Evidence.*

   Generally it is not necessary to exhibit documentary evidence with the pleadings in a suit in equity. (pp. 321, 322.)

3. Receivers—*Equity Jurisdiction.*

   Equity jurisdiction for injunction and receivership cannot be defeated on the ground of dispute as to title to the land affected, when, the record being free from controversy as to facts, the question of title is one of law only. (p. 323.)

4. Mines and Minerals—*Reservations in Deed—Construction.*

   A clause in a deed reserving to the grantor "the right to all minerals in and under" a certain portion of the land conveyed, not limited or qualified as to intention by any other clause of the deed, or by any facts within the knowledge of the parties which may properly be deemed to have influenced them, embraces and saves to the grantor not only solid minerals such as gold, silver, iron and coal, but petroleum oil and natural gas as well. (pp. 323, 324.)

5. Taxation—*Forfeiture—Non-Entry on Land Books.*

   Forfeiture of the title to minerals in a tract of land for non-entry on the land books cannot be predicated on mere severance in title of the minerals from the surface and lapse of time, since presumptively the land was taxed as a whole when the severance occurred and has since been carried on the land book in the same manner and the taxes paid. (p. 326.)

6. Mines and Minerals—*Oil Lease—Termination.*

   A lease for oil and gas purposes may be terminated by express surrender or by a surrender in law, effected by abandonment of the premises by the lessee and resumption of the possession thereof by the lesssor; and whether such surrender in law has occurred is a question of intention. (p. 327.)

7. Same—*Surrender—Evidence.*

   On the following facts, such surrender is held to have been effected: The lease was for a term of five years and as long thereafter as oil or gas should be found in paying quantities or the rental

thereon paid. After the development of one paying gas well and several fruitless efforts to find oil, the gas from that well was used until after the expiration of the five year period, and then the well was disconnected from the gas pipe system as an exhausted well. Thereupon, and more than three years after the last effort to develop more gas or find oil, the lessor executed a new lease to a stranger, under which operations on the land were immediately commenced. (pp. 328, 329.)

8. RECEIVERS—*Appointment—Discretion of Court.*

Though the power of circuit courts to appoint receivers is discretionary, and the exercise thereof will not be disturbed or interfered with by the appellate court, unless it appears to have been abused, such discretion is circumscribed and governed, as to the exercise thereof, by legal and equitable principles, violation of, or departure from, which amounts to an abuse thereof. (p. 334.)

9. SAME.

A receivership is a harsh, drastic and costly remedy, violently disturbing and interfering with the rights of the party whose possession is thereby ousted; wherefore, in order to obtain the appointment of a receiver, the plaintiff must show a clear right to the property, or a lien thereon, or a right to resort to it for satisfaction of a debt, or the like; and, if the allegations of his bill are fully denied by answer and not sustained by evidence, the prayer for a receivership should be refused. ' (p. 334.)

10. APPEAL—*Objections not Raised Below.*

Courts will not tolerate inconsistency in the conduct of litigants. Hence, a defendant to a bill for a receivership of oil wells who, claiming title thereto, allows a decree to be entered placing his tools and machinery, used in and about the same, in the hands of the receiver for operation thereof, without objection, will not be permitted to reverse the decree on that ground. If he desires to withdraw his tools and machinery from the premises, he must ask it in the court below. (p. 336.)

11. SAME—*Supersedeas—Possession by Receiver.*

A *supersedeas* does not take effect until the bond required has been given, and, on the giving thereof, it becomes effective only from the time of the filing thereof, not from the date of the allowance of the writ. If, between the allowance of the writ and the giving of the bond, the receiver, appointed by the decree appealed from, has taken possession of the property, his possession thereof will continue during the pendency of the appeal. (p 337, 338.)

Appeal from Circuit Court, Ritchie County.

Bill by Peter J. Sult against A. Hochstetter Oil Company and others. Decree for plaintiff, and defendant oil company and J. O. Linch appeal.

*Reversed. Remanded.*

Van Winkle & Ambler, for appellant.

J. Newman and A. D. Follett, for appellee.

Poffenbarger, President:

The A. Hochstetter Oil Company, a corporation, having entered upon a certain small tract of land in Ritchie county, known as the Linch farm, and commenced the production of oil therefrom, Peter J. Sult, claiming under a prior lease, obtained a decree appointing a special receiver to take charge of the wells, machinery and appliances on the land and operate the same for the production of oil and gas, and enjoining and restraining said company, its servants, agents and employes from interfering in any way with the receiver's custody and operation of the wells and machinery, and the Eureka Pipe Line Company from delivering to the Hochstetter Company oil produced from the land; from which decree, as well as several other orders previously made in the cause, said company and J. O. Linch, its lessor, have appealed.

Sult's claim of title is founded partly on a lease for oil and gas purposes, executed by J. O. Linch to T. F. Barnsdall, bearing date March 17, 1897, the gas right under which afterwards passed by sale to the Mountain State Gas Company, Barnsdall having developed a gas well on the land and then sold the lease to said company, as to the gas. That company afterwards sold the gas right to the Hochstetter Company. The oil right or privilege passed, by a number of successive transfers, into the hands of Shawmut Oil Company, a corporation organized under the laws of the State of Maine, which, after having drilled an unproductive and worthless well on the land, removed its machinery, tools and appliances from the premises, sold all its other leases on lands in the community and dissolved, and Sult claims the oil right, created by the lease, by purchase from the stockholders of said dissolved corporation. He also acquired, by purchase, one-half of the royalty in oil and gas, reserved by J. O. Linch by the lease, said Linch having sold it to S. P. Linch April 10, 1901, who conveyed it to Sult, March 30, 1904. He sets up another claim, derived as follows: Eleanor Marshall, once owner of the tract of land, containing 215 acres, conveying 100 acres thereof to Elzada I. Harrison, by deed, dated March 9, 1880, out of which she reserved and excepted "the

right to all minerals in and under" a certain fifteen acres thereof, aptly described. Out of the same hundred acre tract, the land involved here, a tract of 44½ acres, including the 15 acres, the minerals under which were also reserved, came ultimately into the hands of J. O. Linch, the lessor of Barnsdall, and he had never acquired the title to the excepted minerals by any conveyances thereof. Eleanor Marshall having died seized of the minerals, so reserved, Sult claims to have purchased them of her heirs. If this reservation included the oil and gas, and the title so held has not been lost in any way, such as forfeiture for non-taxation, the lease executed by J. O. Linch confers no right to take these substances from said fifteen acres of the land.

The A. Hochstetter Oil Company is owner of the gas right, created by the lease from Linch to Barnsdall, as we have seen, and it claims the oil right also under a subsequent lease, executed March 29, 1904, by said J. O. Linch, to one David Gunsburg, who assigned the same to said Hochstetter Company. That company, as well as Linch, asserts abandonment and forfeiture of the Linch-Barnsdall lease, as to both the oil and gas rights, and denies Sult's claim to one-half of the royalty, on the ground that the oil wells drilled by the company were put down under the subsequent Linch-Gunsburg lease, to which Sult is not in any sense a party and under which he does not claim. They deny his right to the oil and gas in the 15 acre portion of the land on four grounds, of which the first is that the reservation was not intended by the parties to the deed to include the oil and gas or either of them, since at the date of the deed, no person had reason to believe these substances were to be found therein, and a substance believed to be silver, had been discovered thereon; the second, that Sult had not acquired the interests of all the heirs of Eleanor Marshall, if they had any title; the third, that J. O. Linch's possession of the land, being adverse, has ripened into good title, and the fourth, that the title of Eleanor Marshall has been forfeited to the state for non-entry on the land books for taxation and transferred to Linch and those claiming under him.

The following grounds of demurrer are assigned: 1, Multifariousness; 2, want of necessary parties; 3, no title shown; 4, preclusion of equity jurisdiction by dispute as to title to the land.

Sult claims the oil in the entire tract of 44½ acres under the Linch-Barnsdall lease and the Hochstetter Company claims the same thing under the subsequent Linch-Gunsburg lease, and there is a controversy between these two hostile claims, each extending to the entire tract of land. The fifteen acre tract, as to which Sult's claim of title stands upon another and different foundation, is a portion of the same tract. Though the pleadings and evidence on the two issues thus presented are different, Sult bases two demands or grounds of action for the same thing and against the same parties on different claims of title, as to a portion of the matter in controversy, namely, 15 acres of the 44½ acre tract. All the parties are interested in both of the issues so raised and the results will differ only as to the extent of the benefit or injury conferred or inflicted. All the parties will be affected by the event of each issue. Therefore, all are vitally concerned and their interests are directly antagonistic. If Sult should suceed on his first ground, he will take the oil in the whole tract, but if that should fail, he may take it in a portion of the tract. In the former case, Linch would receive a portion of the royalty, under the first lease, but, in the latter, none from the fifteen acres, under either lease. If he makes good his defense of forfeiture of the first lease, going to the entire tract, he and those claiming under him take the entire royalty to the exclusion of Sult. If not, Sult will get half of it, though he fail as to the claim of title, founded on the Marshall reservation, and all the oil in the fifteen acre tract, if that claim should prevail. In view of the close and intimate connection of the interests of the parties, and their relation to the same subject matter, we do not feel warranted, by the authorities, in holding the bill multifarious. The interests of all parties will be better subserved by one suit than two. It will save both costs and delay, without imposing any serious inconvenience. "The objection of multifariousness may be disregarded except in plain cases, where thereby the administration of justice will be furthered, and multiplicity of suits avoided." *Johnson* v. *Sanger*, 49 W. Va. 405.

We do not perceive anything in the bill to sustain the view that necessary parties are wanting. No omitted party is named in the brief or otherwise indicated.

Want of sufficient disclosure of title is predicated on the

failure to exhibit with the bill the deeds from the heirs of Eleanor Marshall to J. Newman, to whom it is alleged they made conveyances of their interests in the mineral reservation, and who executed a deed to Sult, purporting to convey such interests. Purchase and conveyance of the interests of all the known heirs, constituting not less than seventeen-twentieths of the reserved minerals, as well as the ownership of the residue by the persons made parties as unknown heirs of Eleanor Marshall, are distinctly alleged, and an · offer to produce and file the deeds to Newman is made. We regard this as amply sufficient. While we do not doubt the requirement of full and complete disclosure of title, we are not aware of any rule requiring the filing of documentary evidence, with the bill. Deeds and other muniments of title are usually exhibited with the bill and then constitute part of the pleadings as well as evidence, but the facts may be alleged and the documents afterwards introduced as evidence.

Except as to the fifteen acre portion of the land, no question of title is involved. The legal title is in J. O. Linch. As to that, there is no controversy, and the contest is between the lessees, claiming under two different leases from the same party. These are mining leases, pure and simple, in which the minerals and mineral rights they carry constitute the only value they have. They create mere rights to enter upon the land and dig and carry away the minerals, and possession of the land, or right to possession thereof, is involved only so far as it is reasonably necessary to the effectuation of this purpose. The substantial right involved is the license, conferred by the contract of lease, an incident of which is the right to sever, and carry away, the minerals, a part of the corpus of the land. This right is peculiar in both nature and subject matter. Its value being neither accurately known nor determinable otherwise than by the event of the exercise thereof, it is liable to irreparable and incalculable injury in many ways, such as waste from negligent or unskillful operation or delay in operation, or loss of valuable wells by the negligent sticking of tools or caving for want of proper casing, in view of all which the possessory remedies afforded by the law courts are generally inadequate. Besides, there is no insuperable bar to the remedy in equity; since the record presents no question of title dependant upon

issues of fact, calling for determination by jury trial as in the case of *Freer* v. *Davis*, 52 W. Va. 1. So much for this ground of demurrer, leaving out of sight the claim of title founded on the reservation clause of the Marshall deed. With that claim in, the case does not fall within the rule denying equity jurisdiction on the ground of dispute as to title. The title to the minerals in the fifteen acre portion of the 44½ acre tract involves nothing more than construction of a clause of the deed, purporting to reserve them, a mere question of law, to be settled on the demurrer to the bill, and, so settled in favor of the complainant, he is immediately within the rule, requiring good title on his part. When the question of title depends upon a question of fact, such result cannot be attained, because it is impossible for the court to determine from the face of the bill that the complainant has good title. The dispute, to defeat an injunction to restrain a trespass, must be such as makes the intervention of a trial by jury necessary. If the facts relating to the title are undisputed, the question is one of law only, and a jury trial is not only unnecessary, but impossible except as to mere matter of form, for the jury must take the law from the court. Entertaining these views, we cannot deny jurisdiction either on the ground of adequacy of the legal remedy, or dispute as to title.

This brings us to the construction of the reservation clause in the deed from Eleanor Marshall to Elzada I. Harrison, reading as follows: "And the party of the first part reserves to herself the right to all minerals in and under fifteen acres of the land hereby conveyed," which fifteen acres is described in the deed by metes and bounds. The meaning of the term "minerals," in the law of conveyancing, has received very great attention by the English courts, and MacSwinney on Mines, p. 12, predicates, upon a thorough review and analysis of the English decisions, the following conclusion: "*Prima facie*, the word mineral must be taken to have a more extensive meaning than its etymology would seem to justify. It has, in fact, been laid down that mineral will, *prima facie*, include every substance which can be got from underneath the surface of the earth for the purpose of profit. And this is apparently the strict scientific meaning of the word. Mineral will, therefore, *prima facie*, include not merely such

articles as coal and ironstone and freestone, but fire clay and china clay or porcelain clay, and also every kind of stone, flint, marble, slate, brick earth, chalk, gravel, and sand: provided only that these articles are under the surface, and do not lie loosely upon it." A vast array of authority cited by him, which need not be analyzed here, sustains this conclusion and shows that the word minerals found in a deed, lease or other contract, unqualified and unrestricted by any other clause in the instrument or by circumstances within the knowledge of the parties which may reasonably be deemed to have determined their intention, is given this broad meaning and effect. He says, however, that in all cases the *prima facie* meaning of the word will yeild to the intention of the parties, when, from the languge of the instrument in question, such intention is made reasonably clear, or the particular circumstances under which an instrument of severance takes place shows an intention to restrict its meaning, and, in doubtful cases, its meaning will be restricted to that given it by the custom of the country in which the contract is to operate. *Id.* 15, 17. As to whether oil or gas are minerals, these decisions are silent, presumably for the reason that no litigation involving these substances seems to have arisen in the courts of that country; but, in view of the holdings, and the expressions of opinion, found in the English decisions, defining the meaning of the term, and extending it to every substance or material that can be profitably taken and used from beneath the surface, no doubt can be entertained as to what the conclusion would have been, had such question been presented, and the principles declared point unerringly to the view that both these substances would be regarded as minerals in the law of contracts. That such is the *prima facie* meaning thereof, in general law, is universally declared by the courts of this country. This is so well understood that no authority for it need be cited. But some American decisions say the parties to a contract are presumed not to have intended, by the use of the term, anything other than solid substances, such as metals, on the theory that only such substances are commonly or popularly known and recognized as minerals. *Dunham* v. *Kirkpatrick*, 101 Pa. St. 36, declares that a reservation by the grantors in a deed, saving minerals, does not include petroleum oil. The

supreme court of Ohio, in *Detlor* v. *Holland*, 57 O. St. 492, came to a like conclusion, in construing a deed, granting all the coal of every variety, and all iron ore, fire clay, and other valuable minerals. This decision was based partly on *Dunham* v: *Kirkpatrick*, and partly on the view that other clauses of the deed, providing for rights of way and giving mineral privileges, disclosed intention not to include oil. On the contrary, the Tennessee court, in *Murray* v. *Allred*, 100 Tenn. 100, declared petroleum oil to be a mineral within the meaning of a reservation in a deed calling for "all mines, minerals and coals in and under the land." In that case, the court reviewed very thoroughly most of the English and American cases. The opinion is exhaustive and carefully prepared, though it does not name or review all the cases in which a contrary conclusion was reached. For many purposes, the Pennsylvania decisions hold oil and gas to be minerals. It is only in respect to deeds and contracts between private persons that a different conclusion has been reached, and that is founded on the supposition that the parties did not intend the term to have so comprehensive a meaning. In many cases, that court has held oil to be a mineral in the sense that it is a part of the realty. *Stoughton's Appeal*, 88 Pa. St. 198; *Funk* v. *Haldeman*, 53 Pa. St. 229. It was held to be a mineral substance within the meaning of the statute providing for mortgages on mining lands. *Gill* v. *Weston*, 110 Pa. St. 312. Oil and gas are held to be minerals, and, therefore, a part of the corpus of the land, as between life tenants and remaindermen. *Blakley* v. *Marshall*, 174 Pa. St. 425; *Marshall* v. *Mellon*, 179 Pa. St. 371. It is to be observed, in this connection, that these decisions do not necessarily conflict with that of *Dunham* v. *Kirkpatrick*, for they declare that, in a legal sense, oil and gas are minerals, while the other case declares that, as tested by the intention of the parties to a deed, disclosed by the terms used therein, viewed in the light of the popular meaning of the term, a mere matter of contract, they are not minerals. The determination of the question of intention by that standard seems to us inevitably to produce a contrary result. Legally and scientifically, oil and gas are universally held to be minerals. At the present time, they are popularly so considered. Moreover, they are substances having a high com-

mercial value, constituting the subject matter of constant conveyances, traffic, barter and sale, and were so known and recognized long before the date of this deed. Found only beneath the surface, and yielding profit, they are, according to the English test, *prima facie* minerals, as we have seen. That the parties may have supposed the existence, in the land in question, of other minerals, such as gold and silver, is not sufficient, under any of the decisions we have examined, to cut down the meaning of the term, and there is nothing in the deed which suggests a restricted or qualified meaning. We, therefore, conclude that the reservation carries the oil and gas, as well as the other minerals in the land.

Forfeiture of title to the minerals for non-entry of the same upon the land books for taxation, is not shown; and, as no transfer of a title from the state to an individual can occur until after the state has, in some way, acquired the title, it is impossible to say J. O. Linch has obtained it in that way. Nothing to the contrary being disclosed, we are bound to hold that, originally, the 44½ acre tract of land, including the minerals, was entered upon the land books and taxed as a whole. It was so owned, and, therefore, presumptively so taxed, prior to 1880. As it was so charged until that day, we must likewise presume that all the subsequent entries thereof for taxation have been made in the same way. *Wallace* v. *Elm Grove &c. Co.*, 58 W. Va. 449. Had a severance of the minerals from the surface been made, at any time since, for the purpose of taxation, it would appear on the land books; and had a separate entry of the minerals thereon ever been made, proof of a subsequent omission of the same therefrom for a period of five years, without more, might be sufficient to establish forfeiture, since there might then be no presumption of taxation of the minerals as part of the land. But the evidence here makes no such case. We are asked to presume severance for taxation because there has been a severance in title. In so doing, counsel asked us to relieve their client, in violation of the general rule of law, from the burden of proving an affirmative issue, its claim of title by forfeiture and transfer. Payment of taxes on the land by Linch, in the absence of a severance of the minerals therefrom for taxation, prevented forfeiture, for it satisfied the whole amount of taxes by entry

and payment under the title under which both he and Eleanor Marshall claimed. Taxation under a strange and hostile title would not do so, but taxation in the name of any person claiming the land in whole or in part under any given title prevents forfeiture, not only as to him and the portion of the land claimed by him, but as to all the land so taxed and all persons claiming the same or any part thereof under the same title. *Whitman* v. *Sayers*, 9 W. Va. 671; *Bradley* v. *Ewart*, 18 W. Va. 598; *Lynch* v. *Andrews*, 25 W. Va. 781; *Hall* v. *Hall*, 26 W. Va. 468; *Loners* v. *Miller*, 12 Grat. 452.

Having concluded that Sult is, *prima facie*, the owner of the oil and gas in the fifteen acre tract, and, therefore, entitled, on well settled principles, to have the property placed in charge of a receiver, pending final determination of the rights of the parties, respecting the same, we pass to the consideration of their respective claims and contentions concerning the status of the Linch-Barnsdall lease, which embraced the entire 44½ acres of land. It being the older lease, Sult, holding the oil right thereunder, indisputably has superior right, unless that lease has been abandoned, or surrendered, or became forfeited, or has expired, or ceased to be operative and effective for some other reason. If the assignments or transfers made to him by the stockholders of the dissolved Shawmut Oil Company do not vest in him legal title to the oil right under the Barnsdall lease, assuming it not to have been lost, as aforesaid, they gave him the equitable title thereto, which a court of equity will protect and vindicate. The Shawmut Oil Company held the legal right, and, in many aspects, as trustee for its stockholders. When it decided not to further prosecute the business for the transaction of which it had been organized, it became a mere trustee, holding the legal title to its assets for the use of its stockholders, subject to the satisfaction of its debts out of the same. Its dissolution, without having disposed of its rights under the Barnsdall lease, made its shareholders the equitable owners of that right, and gave them power to dispose of the equitable title thereto, at least. Code, ch, 53, sec. 59, Code 1906, sec. 2287; *Griffith* v. *Boom & Lumber Co.*, 55 W. Va. 604, 613; *Donally* v. *Hearndon*, 41 W. Va. 519; *Morawetz Co.*, sec. 1032 to 1035; 10 Cyc. 1327 to 1329.

Barnsdall took his lease, March 17, 1897. In that year or the next, he developed a gas well on the premises, and, on November 30, 1898, sold the gas right under the lease, including the well, to the Mountain State Gas Company. After an unsuccessful effort to find oil or more gas or both, made in the year 1897, or 1898, as to which the answers are inconsistent, he ceased operating on the premises, otherwise than by means of the one paying well, withdrew his casing from the "dry hole" he had drilled, and removed every particle of his property from the land. He assigned the oil right to the Southern Oil Company, except as to the fifteen acres, which company assigned it.to Geo. D. Appleton, who, on February 20, 1900, assigned it to the Shawmut Oil Company. That company, after an unseccessful exploration of the property, made in the summer of 1900, likewise withdrew from it, sold all its leases on other lands in the vicinity to the South Penn Oil Company, and, in April, 1903, voluntarily dissolved and surrendered its charter to the state. On the 29th day of March, 1904, Linch executed the new lease to Gunsburg, with the evident intention to declare a forfeiture of the old lease or treat it as having been abandoned, or having expired. Three years had elapsed since the last futile effort to obtain oil was made under it, and the specific term of five years, created by it, had expired on the 17th day of March, 1902, unless the operation of the gas well had kept it alive, by virtue of the clause thereof, providing that the term should continue so long after five years "as oil or gas" should be "found in paying quantities or the rental paid thereon," which clause, it is urged, did not so operate for the reason that the Mountain State Gas Company discontinued the use of the gas well, as not yielding gas in marketable quantity, and did not thereafter, in any way, use the premises for the purpose of the lease, nor do any other act by way of assertion of title under it, until in May, 1904, when it sold the gas right thereunder to the Hochstetter Company. As to the cessation of use of the gas well by the Mountain State Gas Company prior to its sale thereof to the Hochstetter Company, the record is indefinite. The bill alleges payment of the gas rental until January 1, 1905. The Hochstetter Company's answer says the Mountain State Company ceased to use gas from that well in 1903, without naming the day or

month on which the cessation occurred. Linch avers in his answer that it occured before the 29th day of March, 1904, but fails to state when it occurred, and there is nothing in the record from which the exact date can be ascertained. But the answers put it squarely in issue as to whether any gas was used from the well or rental paid under the Barnsdall lease, after January 1, 1904, and the contrary allegation of the bill is not sustained by a particle of evidence. As bearing on the question of intention to abandon the lease, and the impression that it had been abandoned or had expired, the appellants rely upon the following additional statements of fact, set forth in their answers, made under oath: When wells had been drilled on adjacent property and drainage of the Linch property was thereby threatened, Linch made a demand upon the Shawmut Company through one Wright, its manager, for further work and development on his property and was informed that the Company considered the territory worthless and would not make further exploration thereof; in selling out its leases the South Penn Oil Company, after the failure of its search for oil on the Linch tract of land, the Shawmut company, believing the lease thereon worthless, did not include it in the transfer of its rights; and Sult, before purchasing the rights of the shareholders of the defunct Shawmut company, was a competitive bidder with Gunsburg for the new lease from Linch.

Whether a lease has been terminated by abandonment on the part of the lessee and the acceptance of, or re-entry upon, the premises by the lessor, is a question of intention. Though a lease, so terminated, is said to have come to its end by operation of law, the legal result arises from the acts of the parties. The intention, on the part of the lessee, to abandon, and, on the part of the lessor, to resume possession of the premises on his own account and treat the lease as having been surrendered, ascertained from their acts and conduct, is the test. It is not an express surrender, but a surrender which the law declares and enforces when the tenant leaves the premises with the intention not to return thereto and the landlord takes possession of the same with intention to release the tenant from the obligation of his contract and refuse to let him come again into possession of the property. Taylor, Landlord & Tenant, sections 507*a*-516, inclusive; 24

Cyc. 1372, *et seq.;* 18 Am. & Eng. Ency. Law 362. As a
lease for oil and gas purposes differs, in material respects,
from ordinary agricultural leases and leases of buildings and
structures for residence and commercial purposes, the acts
tending to show abandonment and resumption of possession
differ in their nature and probative weight from those having
similar effect in tenancies of other kinds. The subject matter
is different and the reciprocal burden imposed and rights
secured the parties differ from those imposed and secured in
ordinary leases. The cost of developing an oil or gas terri-
tory so as to make it yield profit is ordinarily very heavy.
It requires both time and money. A cessation of operations
for a short time does not signify the same intention as the
abandonment of a place of residence or a mercantile room.
As, ordinarily, after wells have been completed and produc-
tion commenced, no absolute money rental is secured to the
lessor, there is seldom any question as to his intention in ex-
ecuting a new lease to a third party. Such lease is always
executed on his own account, and not on account of the
tenant in the prior lease. The time of abandonment or ces-
sation of operations has important bearing on the question of
intention, but it is obviously not controlling; for abandon-
ment of the premises for a very short time, accompanied by
other acts, showing unequivocal intention not to return to
the property or to do further work thereon, would amply
justify resumption of possession by the lessor and the execu-
tion of a new lease to another party. On the other hand,
the circumstances and conditions may be such as clearly to
negative intention to give up the premises when operations
have been suspended for a considerable period of time.
Thus, in *Henne* v. *South Penn Oil Co.*, 52 W. Va. 192, this
Court held that although the South Penn Oil Company had
removed its material and machinery from certain premises
and drilled wells on other tracts of land which it held under
lease, it had done so without any intention to surrender or
abandon the lease on the premises on which it had made an
unsuccessful exploration. In discussing the case JUDGE
McWHORTER, speaking for the Court, said: "There was
good reason to believe that there was oil some where on the
premises in question and the appellee in locating the well
No. 1, on the lease had made a mistake. It was possessed of

all the contiguous territory. The most natural as well as the most reasonable thing for it to do, as it did, was to remove to a locality nearer the developments already made and to develop in the direction of the premises in question, so as to strike the line of the oil belt and thus be enabled more judiciously to locate another well on the premises where it would be more likely to find the oil it was seeking, and the fact that it owned all the surrounding territory for oil purposes makes it very probable, indeed, almost certain, that it had no purpose of abandoning any one of its leases which was as this was surrounded entirely by its own holdings. If Michaels, the original lessee or any other individual or company holding the lease of a small property, and having no other within his reach or in the neighborhood, and if he should have undertaken and drilled a well on the premises to completion and finding it produced nothing, should remove his machinery and all his apparatus from the premises, it might raise a strong presumption that he had abandoned the property or at least that he did not propose within a very short time to locate and operate another well on the same premises." In *Steelsmith* v. *Gartlan*, 45 W. Va. 27, the lessee, after having drilled an unproductive well, plugged it, removed his derrick and tools, including the casing, and left the premises. The lessor made repeated demands upon him to do further work on the property and, on his refusal to do so, executed a new lease to Steelsmith. The period of absence upon the premises was considerable, but the court, in the reasoning by which it reached its conclusion, laid stress, not upon the length of that period, but upon the conduct of the parties, which left no room to doubt the lesses's intention not to do anything more, or the lessor's intention to treat the lease as ended. In *Parish Fork Oil Co.* v. *Bridgewater Gas Co.*, 51 W. Va. 583, the period of cessation of work or absence of the lessee from the premises was not regarded as having so much weight as the misconception on the part of the lessees of their rights under the contract, and of their having allowed the well they had drilled on the premises to fill up and become worthless, and the contractor, who had drilled that well, to remove all of his machinery from the premises. Another illustration of the manner in which the Court weighs and gives effect to the acts of the parties may be

found in the case of *Lowther Oil Co.* v. *Miller-Sibley Oil Co.*, 53 W. Va. 501. All these cases and numerous others make it plain that the termination of a lease by operation of law on the theory of abandonment and resumption of possession depends entirely upon the intention of the parties, and that the materiality or signification of the length of the period of abandonment is its tendency to prove intention, on the part of the lessee to retain or give up the lease.

Until 1904, the premises in question had been explored repeatedly without discovering or developing anything more than a gas well of light production. Barnsdall had completed this well in 1897. The Mountain State Gas Company having purchased it from him, together with the right to produce and take all the gas in the territory, used the gas from it until in the year 1903 or 1904. Its yield was not heavy. In fact, it was so light that this company finally disconnected it from its system of gas pipe lines. In the meantime, the Shawmut Oil Company had made an unsuccessful effort to find oil on the premises, and this exploration necessarily cast doubt upon the value of the premises as gas territory; for, had there been any gas at the point at which the oil well was drilled, it would have been disclosed. From 1897 or 1898, the date of the purchase of the gas right by the Mountain State Gas Company, until 1903 or 1904, the date on which it ceased to use the gas from that well, it made no effort to find additional gas in the tract of land. It knew the term of five years for which the lease had been given would expire on the 17th day of March, 1902, unless oil or gas should be produced from the premises thereafter, and, although the gas from this one well was failing, and would probably be exhausted in a short time, no effort was made by it to develop additional wells. After the gas had failed, it ceased to use gas from it, disconnected it from a system of pipes, and still neglected to incur the risk and expense of drilling additional wells. That those who, at that time, owned the oil right under the Linch-Barnsdall lease, regarded the territory worthless for oil purposes, there can be no doubt. Oil in paying quantities had never been found and no effort had been made to find any since the year 1900. The Shawmut Oil Company, the owner of the oil right, had sold and disposed

of its leases on other property in the vicinity of the premises in question, and then dissolved and terminated its corporate existence without making any disposition of the lease on this property.. These circumstances and conduct show that the officers and stockholders of that corporation regarded it as of no value, and had no intention to make any further effort to develop the property for oil purposes. Such were the conditions under which Linch executed a new lease to Gunsburg in utter disregard of the former lease. His action in this respect was emphatic and unequivocal, so much so that it is impossible to say that he did not intend to resume possession of the premises for oil and gas purposes. He no doubt had had possession all the time for other purposes, but subject to the right of the lessees under the old lease to enter upon and occupy the land, and make such use of it, as was necessary to the exploration thereof for oil and gas and production of the same. But by this act, he signified intention to no longer recognize this right in the lessees in the old lease. Whether their conduct justified such action on his part, his intention to accept a surrender, if their conduct amounted to an offer thereof, or repossess himself of the premises as to the oil and gas rights, if they had abandoned the same, is indisputable. The only question, then, is whether the conduct of the lessees in the old lease evinced intention on their part to abandon. What explanation have they to make, or can they make, which reconciles their conduct with any other intention? They offer none whatever. Sult's contention is that these facts are not such in their nature as to impose upon him any duty to explain. In other words, by his failure to show a different state of facts, or circumstances and conditions which make these facts consistent with an intention to develope the property and produce oil and gas therefrom, he virtually says this conduct is not evidence of intention to abandon. It must be apparent from observations already made, that we are unable to concur in this view as to its character and weight; and, from principles now to be stated, that the circuit court, for the purposes of the application pending before it, should have regarded the old lease as having been terminated, and refused the request for a receiver as to the wells outside of the fifteen acre reservation.

Though the powers of the trial courts respecting the appointment of receivers is discretionary, and the exercise thereof will not be disturbed by the appellate court, unless the power appears to have been abused, *Smith* v. *Brown*, 44 W. Va. 342, the discretion is necessarily a sound legal discretion, in other words, a power limited, circumscribed and governed as to its exercise, by legal principles, violation of, or departure from, which amounts to an abuse of discretion. It is not an arbitrary or unrestrained power vested in the trial courts. The bill must lay a foundation for the appointment of a receiver by stating facts which show the necessity and propriety of it. *Wilson* v. *Maddox*, 46 W. Va. 641; *Frazer* v. *Brewer*, 52 W. Va. 306; *Wood* v. *Wood*, 50 W. Va. 570; *Kanawha Coal Co.* v. *Ballard & Welch Coal Co.*, 43 W. Va. 721; *Dunlap* v. *Hedges*, 35 W. Va. 287; *Krohn* v. *Weinberger*, 47 W. Va. 127. A receivership is a harsh, drastic and costly remedy, violently disturbing and interfering with the rights of the parties whose possession is thereby ousted. Though the possession of the receiver may be, as is sometimes said, the possession of the owner or on his behalf, and will be so treated in the ultimate disposition of the case, he who is in possession when the receiver is appointed must he regarded, at the outset, as *prima facie* the owner of the property. For this reason, courts of equity should exercise extreme caution in the appointment of receivers and always withhold the remedy until a proper case has been made therefor. *Ruffner Bros.* v. *Mairs & Bro.*, 33 W. Va. 655; *Wood* v. *Wood*, cited; *Kanawha &c. Co.* v. *Ballard &c. Co.*, cited; *Freer* v. *Davis*, 52 W. Va. 35. In the well considered case of *Kanawha &c. Co.* v. *Ballard &c. Co.*, it is said that, in order to obtain the appointment of a receiver, the plaintiff must show that he has a clear right to the property itself or a lien upon it or that it constitutes a special fund to which he has a right to resort for the satisfaction of his claim. It is believed that this Court has not in any instance departed from, or relaxed, this cardinal principle of the law of receiverships. It has uniformly placed the burden upon the applicant to show a clear title to the right claimed by him or a very strong probability of the genuineness of his claim and the ultimate establishment thereof. "When the equities of the bill are fully and fairly denied by answer,

unles the plaintiff overcomes such denial by other testimony, the question should no longer be regarded as one addressed to the discretion of the court, but it is error to appoint a receiver when the charges of the bill are so denied. *Wilson* v. *Maddox*, 46 W. Va. 641; High on Receivers, section 24. The same principle is asserted in *Freer* v. *Davis*, in which it appeared, from the bill and answer, that the plaintiff's claim of title was emphatically denied and the denial not overcome by evidence adduced to sustain the allegation of the bill. There was no departure from it in *Frazer* v. *Brewer*, 52 W. Va. 306, for it was there ascertained, from the bill, answers, affidavits and exhibits, that the facts, circumstances and legal presumptions disclosed were strongly in favor of the plaintiff's equity and rendered it highly probable that the relief asked for would ultimately be granted, and that the acts of the defendants, if left in control of the property, pending the litigation, would work irreparable injury to the plaintiff. This suit was instituted in July, 1905, and the receiver was not appointed until February, 1906. In the meantime, the cause had been erroneously removed in to a federal court, and remanded to the circuit court of Ritchie county for want of federal jurisdiction. Notwithstanding this interruption, ample time and opportunity were afforded the plaintiff to produce evidence in the form of affidavits to sustain the allegations of the bill and to overcome the matters of fact set up in the answers, which, uncontradicted and unexplained, show that, in law, the lease under which he claims had been surrendered. Instead of producing such evidence, he filed the affidavit of the clerk of the county court of Ritchie county, tending to show that the defendant company had no property in Ritchie county; his own affidavit showing the location of the wells on the land and the production thereof; the affidavit of S. E. Nickum, showing probability of the drainage of the land by a well located on an adjacent farm; and the affidavit of O. W. Henry, showing that the defendant company had sold its leases on certain farms in Wood county and had practically ceased operations for oil and gas in the State of West Virginia elsewhere than on the land in controversy, and was principally engaged in such operation in the Indian Territory and the State of Kansas. None of these affidavits go to the serious question of the

surrender of the lease or controvert in any manner whatever the averments of the answers, positively and emphatically contradicting and denying the allegations of the bill, by the disclosure of facts, which, if true, negative the existence of the title asserted by the bill. Neither good title nor probability of the establishment thereof is shown, and no circumstance, emergency or exigency is disclosed which called upon the court below to relieve the applicant provisionally from its obligation to establish, *prima facie*, the title for vindication of which it has sued, or justified it in so doing, if, indeed, that can be done in any case.

Reversal of the decree, in whole or in part, is sought on the ground that it places in the possession of the receiver the machinery, tools and appliances of the defendant, and authorizes him to use the same in operating the wells. Ordinarily, the court cannot commit to the possession of its receiver property other than that in controversy in the suit. High. Rec. section 378; Smith Rec. section 53; *Noyes* v. *Rich*, 52 Me. 115; *Wormser* v. *Bank*, 49 Ark. 117. The plaintiff does not claim title to the tools and machinery used in the operation of the wells in question here. They are confessedly the property of the defendant; but they were, at the time of the appointment of the receiver, used by it in the operation of what it then claimed, and still claims as its own wells. Its desire both to have these wells operated and to have its machinery and tools used in the operation thereof was manifested by its own conduct, respecting both the wells and the tools. It devoted and applied its tools to that work for its own benefit, and the operation of the wells and the use of the tools, under the receivership, is, conditionally, for its benefit. It did not, at the time of the appointment, disclaim title to the wells or express a desire to have operation thereof discontinued, or to withdraw its tools for use elsewhere, or to have them relieved from the burden of use by the receiver, and accordingly demand the possession thereof. Had it done so, it may be that the court would have been compelled to allow removal of such of them as could have been detached without doing serious injury to the wells, but, by its silence and acquiescence, it has thus far waived any right of that kind it may have had. From its silence, taken in connection with its alleged ownership of

the wells and consequent operation thereof for its own bene-fit, its consent to the use of its tools by the receiver may be presumed. If it intended otherwise, fairness to the court and the opposite party imposed the duty of giving notice to the contrary at the time of the appointment of the receiver. Had the court, without its consent, ordered a cessation of opera-tion by the receiver for the purpose of removing defendant's machinery and installing some other, and thereby endangered the wells or subjected the land to drainage by means of wells on adjacent property, it may well be assumed that a protest would have been made on that ground more vigorous, and perhaps better founded, than the one now entered on the other ground. Two courses were open to the court and the parties. The court and the plaintiff took one, presum-ably with the consent of the defendant. To allow it to reverse the decree, for the cause shown, would sanction a "fast and loose" method of practice, on the part of litigants, which has not hitherto been recognized, and cannot be intro-duced without greatly embarrassing the administration of justice. Courts will not tolerate in parties the taking of in-consistent positions. *Town* v. *Ralston*, 48 W. Va. 186; 11 Am. & Eng. Ency. Law 446; Bigelow on Estoppel 687; *Ellis* v. *White*, 61 Ia. 644. These observations are limited to the appeal from this interlocutory decree. It is not intended here to say the tools and machinery cannot hereafter be with-drawn from the wells, or that they should not be excepted from a final decree, perpetuating an injunction and adjudg-ing title to the wells to be in the plaintiff, in such a case as this. In the rendition of its final decree, as well as at any time before final decree, the court has power to modify any or all of its interlocutory decrees and orders. Our conclu-sion here is to deny to the appellant the right to reverse or modify the order appointing the receiver so as to give relief it never asked for in the court below, probably did not want, and the right to which it must be deemed to have waived un-til it shall have made a proper request for it in the court be-low.

Another inquiry concerns the effect of the *supersedeas* awarded by this Court, in view of the circumstances attend-ing the execution of the decree of the court below and the perfecting of the *supersedeas* by the giving of the bond.

The decree appealed from was suspended for a period of fifty days to enable the defendant to obtain an appeal, which it failed to do within that time. In the meantime, Carver, the special receiver, declined to act, and notice of an application to have the Parkersburg Banking and Trust Company substituted for him in the order, on the 28th day of April, 1906, was given. On the 27th day of April, 1906, the clerk of this Court notified counsel for the defendant that an appeal and *supersedeas* had been allowed on that day. Thereupon said counsel gave counsel for the plaintiff and the judge of the court below notice of the fact by letter, dated April 27th, and did not appear on the following day and resist the application for substitution of the Banking and Trust Company as special receiver, and the order was made, and on the 2nd day of May, 1906, it took possession of the property. The *supersedeas* bond, required by the order of this Court, the giving of which was a condition precedent to the taking effect of the *supersedeas*, Code, chapter 135, section 14, was not filed until May 7, 1906, five days later. If the writ did not become effective in any sense until the bond had been given, it seems immaterial whether it was allowed on April 27th, as indicated by the clerk's telegram, or May 1st, as shown by the order. It was no doubt actually allowed April 27th and the allowance noted in the order book May 1st, the date of the first actual sitting of the Court after its allowance. Whether we can go behind the order and now certify that it was allowed April 27th, it is useless to inquire, for the reason stated, and it is only necessary to say whether the giving of the bond after the receiver had taken possession of the property made the *supersedeas* operate by relation from the date of the allowance thereof, and so make his possession, acquired after the allowance, wrongful. The plain letter of the statute, saying the *supersedeas* "shall not take effect until bond is given" seems to forbid this conclusion, as does also the authority given by statute to suspend judgments and decrees for a reasonable time to enable the losing party to obtain appellate process. If the statute used the word "unless" instead of "until," there might be latitude for such construction; but the presence of the word "until" renders its adoption impossible without restriction of the meaning of that word to something less than it signifies in ordinary

use, for it would make the *supersedeas* effective from the date of the allowance thereof, which might be long prior to that of the giving of the bond. Such a construction would, not only encourage delay in procuring appeals, but also lead to confusion and complication in procedure. This construction accords with that adopted by the Virginia court in *Williamson* v. *Gayle*, 4 Grat. 180, and *Bristow* v. *Home Building Company*, 91 Va. 18, the latter of which declares as follows: "If a receiver is in possession of property at the time the *supersedeas* is awarded, he is not thereby removed."

Other assignments of error go to the action of the court in denying a motion to remove the cause to the circuit court of Wood county, on the ground of disqualification of the judge of the circuit court of Ritchie county; the election of a special judge to try the cause; the re-docketing of the cause in Ritchie county, after removal to the federal court and remand therefrom; and the hearing of the motion for the injunction and appointment of the receiver in the absence of interested parties. All of these are virtually abandoned, as nothing is said in support of them in the brief. No known parties were omitted and the unknown persons interested were made parties as such. Neither any statute nor principle of the common law imposes upon a court, whose judge is disqualified to try a cause, absolute duty to remove it to another court. In view of the provision made by law for the election of a special judge, Code, chapter 112, section 11, when the judge is so situated that he cannot try any given case, and for calling in the judge of another court, for any reason deemed sufficient by the judge of any circuit court, Code, chapter 112, section 3, we are unable to see how the disqualification of the judge to try a particular case can be regarded as good cause for the removal thereof to another court. That the cause was still at rules, or should have been, when the order complained of was made, is wholly immaterial, since an injunction can be awarded or receiver appointed in any stage of a pending cause.

From the principles and conclusions stated, it follows that, in so far as the decree appealed from relates to, or effects, wells on the tract of land outside of the fifteen acre reservation, and places the same in the hands of the receiver, and the machinery, tools and appliances used in connection there-

with and not in connection with the well or wells on said reservation, it must be reversed and the receiver discharged, after having accounted for the property and funds that have come into his hands by reason of its receivership of such wells, and, in all other particulars relating to the receivership, the only matter before this Court, it will be affirmed, costs in this Court will be awarded to the appellant and the cause remanded for further proceedings accordant with the principles and conclusions herein stated and the rules and principles governing courts of equity.

*Reversed. Remanded.*