## Seaboard Oil Company v. Commonwealth.

(Decided February 3, 1922.)

## Appeal from Allen Circuit Court.

1. Criminal Law—Abandoned Gas Wells.—The provision of section 3914a of the statutes requiring that abandoned oil and gas wells shall be plugged in the manner described therein applies to an abandoned well which is cased as well as to one which is not cased.

2. Statutes—Construction.—The intention of the legislature as gathered from the entire language of a statute is the one that should prevail in construing it, and words and phrases used therein will be given their usual and ordinary signification, unless they have acquired a technical meaning and it appears from the statute that such meaning was the one intended, and this rule applies to criminal and penal statutes as well as to one of a civil nature only.

3. Criminal Law—Abandonment of Operation.—By the term "abandonment" in the statute referred to, is meant a relinquishment or cessation of operation without any intention to resume, and whether or not it was intended is a question of fact to be determined from the acts, conduct and expressions of the parties, but the latter alone are not in themselves conclusive of the question.

4. Criminal Law—Abandonment of Oil Well.—An instruction upon the trial of an indictment for committing the offense denounced by the statute, supra, which defines "abandonment" as " the permanent failure to operate said lease and wells," is erroneous, since it authorizes a conviction for the abandonment of the lease alone, and does not take into consideration the necessary element of intention, and leaves the jury to speculate as to what constitutes "permanent failure."

HARPER & DENTON and GARNETT & VANWINKLE for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and defendant, Seaboard Oil Company, was tried and convicted in the Allen circuit court of violating the provisions of section 3914a of the Kentucky Statutes, Carroll's edition, which in part says: "It shall be unlawful for any person or persons, corporations or companies to abandon any oil or gas wells, either dry or producing, in this Commonwealth, or to remove casings therefrom, whether same be either oil or gas, either producing or dry, or for any cause abandon said well or wells without first plugging same in a secure manner by placing a plug of pine, poplar or some other material which will prevent said well from becoming flooded, said plug to be placed above the oil producing sand or sands, and filled in above for the distance of seven feet with sediment or clay and placing upon same another plug of similar material as that of the first and also placing about ten feet below the said casing another plug of like material as above referred to, seven feet of sediment or clay, and then another plug, all plugs to be securely driven in so that no water can pass the same, before the casing is removed."

The penalty fixed for such violations is a fine of not less than one hundred ($100.00) dollars and not more than one thousand ($1,000.00) dollars in the discretion of the jury, and in this case it was assessed at the sum of three hundred ($300.00) dollars, upon which judgment was rendered, and defendant's motion for a new trial was overruled and it prosecutes this appeal urging as grounds for reversal (1), that its motion for a directed verdict of acquittal should have been sustained, because (a) the well which it is charged with abandoning without plugging was a cased one and the casing was in it at the time of the indictment as well as at the time of the trial and had never been removed therefrom, (b) because the evidence did not show an abandonment of the well within the legal meaning of that term as used in the statute, and (2), because of error in the instructions given by the court to the jury. The contentions of counsel for appellant will be disposed of as briefly as possible in the order named.

1. At first blush, and upon only a cursory reading, it must be admitted that contention (a) has some plausibility for its support, but a critical and analytical reading of the statute, in the light of statutory and common law rules adopted and applied in arriving at their true in-

terpretation, has convinced us that the contention is erroneous and that the *abandonment* referred to in the statute under consideration is not one applicable alone to uncased wells, but includes those which are cased if the facts constitute "abandonment." It is a well known rule for the interpretation of statutes that the court should ascertain from their terms, as contained in the entire enactment, the intent and purpose of the legislature and to administer that intent and purpose. Furthermore, that words will be given their ordinary and usually understood meaning, unless a different technical meaning, as gathered from the entire contents, was intended. These rules are so fundamental and have been reiterated so often by this and other courts that it is deemed unnecessary to insert supporting cases. We have, however, a statute (section 460) which expressly declares, in substance, the above common law rules and enjoins upon the courts the duty to construe the language of statutes "according to the common and approved usage of language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such meaning;" and section 459 of our statutes says: "There shall be no distinction in the construction of statutes between criminal or civil and penal enactments. All statutes shall be construed with a view of carrying out the intention of the legislature." With these common law and statutory rules as our guides, we shall now endeavor to determine the intention of the legislature in enacting the statute under which defendant was indicted and tried.

It will be observed that the first part of the statute makes it unlawful for any of the persons named therein "to abandon any oil or gas well, either dry or producing, in this Commonwealth," which language is immediately followed, but separated by a comma, with the language "or to remove casings therefrom, whether same be either oil or gas, either producing or dry, or for any cause abandon said well or wells," without first plugging them as therein directed "before the casing is removed." The phrase "or to remove casings therefrom" was evidently intended by the legislature to *ipso facto* create such an abondonment as it was intended to prevent without plugging, for that which follows plainly indicates that even a producing well may be abandoned by the remov-

ing of the casing therefrom, and the last quoted language is finally followed by "or for any cause abandon said well or wells," showing quite conclusively that the legislature had in mind that the drawing of the casing from the well was one method of abandonment but not necessarily the only act or conduct which would create abandonment. Moreover, if it was intended that a cased well could not be abandoned as long as the casing remained in it, much simpler and more easily understood terms could have been employed by confining the application of the section to only such wells as were not cased. Again, we should not overlook the purpose of the legislature in requiring abandoned wells to be plugged. It is a scientific fact, of which courts will take judicial knowledge, that water standing in a well upon geological formations which contain oil and gas will drive the mineral substance therefrom and, perhaps, damage not only the productiveness of the immediate surrounding deposits, but will also injure that of contiguous territory, and to completely shut off and prevent such standing water with its damaging consequences the legislative purpose was to require all wells actually abandoned to be plugged in the manner prescribed. The legislature of Ohio passed a statute similar in many respects to the one now under consideration, which required "that the owner or operator of any gas or oil well when about to abandon or cease operating the same, and before drawing the casing therefrom" shall plug it in the manner pointed out therein. In the case of State of Ohio v. The Oak Harbor Gas Co., 53 Ohio St. 347, the appellee was indicted for violating that statute of Ohio. The well involved there had been cased, and the casing had not been drawn, as is also true in the instant case. The same insistence was made there, as is contained in contention (a) here, but the Supreme Court of that state in denying it said: "What is meant by the statute is a permanent abandonment, or a permanent ceasing to operate, followed by pulling out the tubing, and usually, though not always, followed by drawing the casing. It is therefore not necessary to the abandonment of, or ceasing to operate a well, that the casing should be drawn, and it is not necessary to make an averment to that effect in the petition." Our conclusion, therefore, is that a well which is cased may be abandoned which is uncased, but the drawing of the casing with no intention of replacing it is itself an act of abandonment

for the punishment of which the penalties of the statute may be invoked.

This brings us to a consideration of contention (b), calling for a definition of the word "abandonment," as used in the statute. Etymologically, according to Mr. Webster, the word "abandon" means: "To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert, as a person to whom one is bound by a special relation, as of allegiance or fidelity; to quit, forsake." In law the act of abandonment consists in both fact and intention. Thus in the case of Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, it was held that "to constitute abandonment by the lessee of a lease for oil, there must be both an intention to abandon and an actual relinquishment of the leased premises." The same question was involved and similarly determined in the case of Sult v. Hockstetter Oil Co., 63 W. Va. 317, 61 S. E. 307, as is also true in the case of Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107. The facts in the latter case were very similar to the ones here, except the period of absence from the premises by the lessee was perhaps longer than it was in the instant case. But the court in its opinion did not stress that fact so much as it did the conduct of the lessee, "which left no room to doubt the lessee's intention not to do anything more." These West Virginia cases and others are referred to and commented upon by Mr. Archer in his work on the Law and Practice in Oil and Gas Cases, pages 506-507, and on the latter page he says, quoting from the Sult case: "All these cases, and numerous others, make it plain that the termination of a lease by operation of law on the theory of abandonment and resumption of possession, depends entirely upon the intention of the parties, and that the materiality or signification of the length of the period of abandonment is its tendency to prove the intention on the part of the lessee, to retain or give up the lease." Other cases in point are St. Peter's Church v. Bragaw, 144 N. C. 126, 10 L. R. A. (N. S.) 633; Burke v. Bishop, 175 Fed. 167; Sazlehner v. Eisner and Mendelson Co., 179 U. S. 19; Moore v. United Elkhorn Mines (Ore.), 127 Pac. 964; Moffat v. Blue River Gold Excavating Co., 33 Colo. 142;

Promentory Ranch Co. v. Argile, 28 Utah 398, and many other cases in Second Series of Words and Phrases, vol. 1, pages 2-9, inclusive.

This court in the case of Bay State Petroleum Co. v. Penn Lubricating Co., 121 Ky. 637, had before it a similar question, with reference to the necessary elements of abandonment, as is presented by this record. The court in its opinion refers to and quotes from the West Virginia court in the Steelsmith case, *supra,* and adds: "He (the lessee) could not abandon the premises, and wait years for another development to inform him whether it would pay to put down other wells on the property." We, therefore, see that the question of abandonment is one of intention primarily, but the intention to abandon may be gathered from the conduct of the parties independently of what they may claim was their mental attitude with respect thereto.

The facts in this case, as developed by the testimony, are that defendant completed and cased the well, which it is charged to have abandoned, in April, 1919. On the same lease about one thousand feet therefrom it completed the boring of another well on May 25 thereafter, which proved to be dry. The first one had a slight tracing of oil, and water arose in it to the depth of about ninety feet. Other wells were being drilled upon adjoining leases on three sides of defendant's lease. The showing of oil in the first well bored was very meager and it was a bare speculation as to whether it would ever be made to produce more than from one to five barrels per day. But defendant concluded that it would not draw the casing therefrom and would not test it by pumping until it sunk other wells in the immediate vicinity, in the pumping of which, and the one first bored, the same power could be used. It therefore deferred the boring of other wells on that lease, as it claims, until further development on adjoining leases, from which latter results it would be the better enabled to select locations for other wells which it might or might not drill on its lease, dependent upon the success of the unfinished wells (either contemplated or actually begun) on adjoining leases, and under the conditions as thus testified to it moved its rig from the lease and never brought it back. It, however, left some tubing and other material thereon which were removed under the conditions hereinafter shown.

On August 25, 1919, defendant's lessor brought suit to require a forfeiture of the lease upon the ground that it had been abandoned contrary to its terms, and that defendant had failed to pay at the proper time the stipulated rent. It appears that the rent had been paid up to February, 1920, and the suit could have been successfully defended, but some time in the first half of the year 1920 (the exact date not being shown) an agreement was effected by which the suit was settled by the lessor repaying to defendant the rentals which it had paid and the lease was turned back to the lessor with the privilege for defendant to remove all material it had on the lease, but to leave the casing in the well in question. In September, 1920, an order was entered in that suit "dismissed settled."

The facts in this case bearing upon the question as to whether defendant abandoned the well, for which act it was indicted, are very similar to those found in a number of the cases, *supra*, in which it was held that they were sufficient to authorize a finding of the fact of abandonment. It is not overlooked that in those cases the thing abandoned was the lease instead of a well, as in this case, but we take it that the elements of abandonment, and the facts necessary to constitute it in the one case are practically, if not exactly, the same as in the other.

It will be observed that under the evidence as above recited the expressed intention of defendant to resume operations upon the lease after moving its drilling machinery therefrom was entirely conditional, and we are not informed whether the fact upon which the condition was to be determined ever happened, and if so what the result was; *i. e.,* whether the wells on the adjoining leases were ever completed, and if so whether they were producing or dry ones. It was nearly a year after the drilling machinery was removed before the lease was surrendered, and more than a year before any record was made of that fact. Under the circumstances, we think it was pre-eminently a question for the jury to determine whether the well had in fact been abandoned by defendant and we must therefore overrule contention (b).

2. The court gave to the jury instructions numbers 1, 2, and 3. The first one submitted to the jury the facts constituting the offense, as defined in the statues, and about which no complaint is or can be made; the second one was the reasonable doubt instruction, and the third

attempted to define to the jury ''abandonment,'' and it is in these words: ''Abandonment, as used and predicated in instruction No. 1, is the permanent failure to operate said lease and wells.'' This instruction is erroneous for two reasons, the first of which is that defendant was not indicted for failing to ''operate'' the lease, but only for failure to plug the well after it had been abandoned. It could have operated on the lease in other parts of it and yet abandon the well. Furthermore, the instruction left it to the jury to determine what was meant by the phrase ''permanent failure.'' Under it the jury was authorized to conclude that there was a ''permanent failure'' from the mere fact of a suspension of pumping or operating the well, although no intention of its abandonment was ever entertained by defendant. The jury should have been told, in substance, that abandonment was a matter of intention to be determined from the conduct and acts of defendant and that if it should believe from the evidence that defendant, when it left the well and removed its machinery from the lease, or thereafter and within twelve months before it surrendered the lease to the lessor it had no fixed purpose or intention to return thereto and resume operations of the well, there was an abandonmnt of it by defendant, and if the jury so found it would find the defendant guilty.

The error in instruction No. 3 was material and prejudicial, and because thereof the judgment is reversed with directions to grant a new trial, and for proceedings consistent herewith.