**Carl McDONALD, Appellant,**

v.

**SNYDER CONSTRUCTION COMPANY, Respondent.**

**No. 15058.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 26, 1988.

Gregory Stremel, Johnson & Stremel, Neosho, for appellant.

Daniel D. Whitworth, Myers, Taylor & Whitworth, P.C., Webb City, for respondent.

CROW, Chief Judge.

This appeal presents the question of who owned certain "minerals, gravel, stone and clays" removed from a parcel of real estate in Jasper County and used for "compaction fill" on a highway project. Each party traces its claim of ownership back to a common grantor, American Zinc, Lead and Smelting Company ("American Zinc"). The controversy arises from four deeds.

On September 1, 1962, American Zinc, by a "Corporation Warranty Deed," conveyed certain described land to William Pendergraft and Caroline Pendergraft, his wife. Included in the description were the 40 acres involved in this litigation, henceforth referred to as "the subject tract." Relevant excerpts from this conveyance are set forth below.[1]

On October 25, 1974, Azcon Corporation, identified in the transcript as a "successor" to American Zinc, executed a "Quit-Claim Deed" to appellant Carl McDonald ("McDonald"). Pertinent excerpts from this conveyance are set forth below.[2] The con-

1. "[American Zinc] does by these presents grant, bargain and sell, convey and confirm unto the [Pendergrafts] ... [the subject tract].

[American Zinc] reserves unto itself ... all coal, oil, gas, lead, zinc and other minerals in, upon or underneath the lands herein described, together with all mining rights connected therewith, including the right to enter upon said lands, prospect for, dig and remove any and all minerals in, upon or contained in said lands, with the right to use so much of the surface of said lands as may be necessary for prospecting, mining and milling purposes, it being understood and agreed that [American Zinc] shall have the right to purchase such part of the surface of said lands as it may require for mining and/or milling purposes at the reasonable market value thereof ...

[American Zinc] further reserves the right of ingress and egress on said lands for the purpose of carrying on prospecting, mining and milling and all uses incident thereto, and further reserves to itself all tailings, boulders and mine refuse as may hereafter be deposited on said lands as a result of operations hereafter conducted, with the right to enter said lands and remove the same at any time. [American Zinc] agrees not to drill within one hundred (100) feet of any buildings on said lands without permission of [the Pendergrafts], and further agrees not to locate any shaft or plant upon said lands which would necessitate the moving of any major buildings such as house or barn, and agrees to pay to [the Pendergrafts], their heirs and assigns, any damage to growing crops caused by its drilling operations."

2. "[Azcon Corporation does] by these presents remise, release and forever quit claim unto [McDonald] ... the following described ... land ...:

veyance described 21 parcels of land, one of which was the subject tract.

On November 15, 1978, Caroline Pendergraft, a single person,[3] executed a warranty deed conveying the subject tract to respondent Snyder Construction Company, a corporation ("Snyder"). A relevant excerpt from this conveyance is set forth below.[4] Snyder's purpose in acquiring the subject tract was explained at trial by its president. He recounted that in September, 1977, Snyder had been awarded a contract by the Missouri State Highway Department for a construction project on a portion of highway 71. The project included building an embankment for an overpass at an intersection near the subject tract. Snyder bought the subject tract as a convenient source of "fill material" for the embankment. During construction in the years 1978 and 1979, fill material described by Snyder's president as "basically a mixture of clay and gravel, one that we commonly refer to ... as Missouri Dirt," was removed from the subject tract by Snyder's employees and used as "embankment fill" for the overpass. The trial court found that the material was removed from an area on the subject tract between 12 and 15 acres in size, to a depth of 5 to 8 feet. That finding is unchallenged.

On June 22, 1979, Azcon Corporation executed a "Correction Quit Claim Deed" to McDonald. The deed described three parcels of land, one of which was the subject tract. Relevant excerpts from this conveyance are set forth below.[5]

On July 31, 1980, McDonald commenced this action by filing a petition against Snyder. The petition averred that McDonald had acquired the "mineral rights" in the subject tract by virtue of the 1974 deed from Azcon Corporation, that Snyder, without McDonald's consent, had removed an estimated 158,208 cubic yards of "minerals, gravel, stone and clays" from the subject tract, and that McDonald had thereby sustained damages of $79,104. The petition prayed for "an award of treble damages in accordance with ... Section 537.340 R.S. Mo."

On August 11, 1986, the parties filed in the trial court a "Stipulation for Bifurcated Trial," providing, so far as relevant here, that (a) the trial court, without a jury, could hear and determine the question of "the extent of each respective party's interest in and to material removed as alleged in [McDonald's] petition," (b) all other issues were reserved for jury trial on a subsequent date, (c) should the court find that McDonald had an ownership interest in the material removed, the parties would proceed with the second segment of the trial, addressing all remaining issues, and (d) should the court find that McDonald had no ownership interest in the material removed, such determination would be treated "as a

---

All the mineral rights to any ore or ores, petroleum, chats, stone, lying below the surface on the below described lands that have been owned by ... American Lead Zinc and Smelting Company ... This Quit Claim Deed is for the mineral rights on these lands. Mineral Rights Only".

3. At trial, McDonald's counsel referred to Caroline Pendergraft as the "survivor" of the two grantees in the deed of September 1, 1962. McDonald's brief characterizes her as "the widow Pendergraft." It is implicit that both parties to this litigation assumed that on November 15, 1978, Caroline Pendergraft was the sole owner of the interest conveyed to her and her husband by the deed of September 1, 1962.

4. "Subject to mineral reservations as set forth in Warranty Deed dated September 1, 1962, ... retained by American Zinc ... which rights were transferred to Carl E. McDonald by Quit Claim Deed dated October 25, 1974 ..."

5. "Azcon ... does, by these presents, remise, release, and forever quitclaim unto McDonald ... all of Azcon's rights, titles, and, interests (if any) subject to any related restrictions and obligations in and to the following-described ... parcels of land ... to-wit:

....

[The subject tract] All reserved by and to American [Zinc] in its September 1, 1962 deed to William Pendergraft and Caroline Pendergraft, his wife, and not previously or subsequently conveyed by American [Zinc] ... and not acquired by any other party by operation of law, equity or otherwise, said deed ... which, by this reference, is incorporated herein.

....

(THIS INDENTURE is made to correct that certain quit claim deed from Azcon to McDonald on October 25, 1974, to the extent that said deed relates to the above Premises ...)"

directed verdict in favor of [Snyder] and as a final judgment disposing of all factual and legal issues before the court."

Evidence was thereafter presented to the trial court by both parties. On December 9, 1986, the trial court filed "Trial Findings and Judgment," including, *inter alia:*

"21. That the reservation [in the 1962 deed to the Pendergrafts] specifically refers to 'coal, oil, gas, lead, and zinc' with the word minerals modifying these specific minerals which could then include metals and fossil fuels of comparable physical or chemical composition and uses. .

22. That the inorganic materials removed by [Snyder] were common ordinary soil abundantly indigenous to this area possessing no unique characteristic comparable to metals or fossil fuels even being unable to meet Highway Department specifications as construction fill except after being actually used and as such are not included in the original grantor's reservation of minerals.

23. That were it otherwise, the Pendergrafts purchased little if anything because the reservation appears as broad as the grant since it refers to all minerals *'in, upon, or underneath* (emphasis supplied) the lands' and it is not demonstrated that the original grantor intended to sell a long time employee land by warranty deed that he could only use if the grantor didn't use it.[6]

24. That minerals, as used in the reservation, did not include soil, undisturbed by grantor's mining, seems further substantiated by the specific reservation of tailings from subsequent mining or milling which reservation would include the soil [Snyder] removed and used for fill.

25. That the materials removed by [Snyder] from its property are not minerals included within the reservation claimed by [McDonald] as his property.

It is therefore ordered and adjudged that [McDonald] have and recover nothing of [Snyder] and that [McDonald] pay costs."

McDonald appeals, briefing one assignment of error. It states:

"The trial court erred in its ruling ... in paragraphs 21, 22, 24, and 25 ... that the material removed by [Snyder] from the property in question ... were [sic] not minerals included within the original grantor's reservation which [McDonald] now owns because the proper test for construing the mineral reservation is examining the intent of the parties in that while this case is one of first impression in Missouri, other courts have held that where mineral descriptions in deeds are ambiguous, it is proper to consider extrinsic evidence as to [the] situation of the parties at the time of the execution, circumstances surrounding the transaction, and the intent of the parties."

McDonald, in his testimony, characterized the material removed from the subject tract by Snyder as "Class A fill material." A "testing engineer" who performed a "chemical analysis" on a sample of earth from the subject tract in 1978 found that its "major components" were: silica dioxide, 78.90 per cent; ferric oxide, 10.87 per cent; aluminum oxide, 4.13 per cent; moisture, 1.66 per cent; calcium oxide, .68 per cent; and magnesium oxide, .33 per cent. The engineer's report concluded: "Basic composition Silica Rock." The trial court, in its findings, adopted the engineer's conclusions, and they are unchallenged here. The trial court found that none of the components "were in the necessary form or sufficient quantity to be economically recoverable." That finding is based on competent and substantial evidence, and is likewise unchallenged.

McDonald begins his argument by conceding there is no Missouri case addressing the issue of whether Class A fill "is a part of the mineral estate or part of the surface

---

**6.** McDonald's evidence showed that William Pendergraft was an employee of American Zinc "for many years, one of [its] loyal people." He had lived on American Zinc's lands as a renter, and upon retirement wished to buy some land on which to reside. American Zinc "sold him certain ... landholdings and reserved the mineral rights."

estate." McDonald also acknowledges there is no Missouri case addressing the issue of what is a mineral.

It is obvious, of course, that the outcome of this appeal hinges on whether the term "other minerals" in the reservation in the 1962 deed includes the material removed from the subject tract by Snyder and used in constructing the overpass. It does not necessarily follow, however, that we must judicially adopt a definition of "minerals" in order to resolve that issue. The better course, it seems to us, is to study the cases most factually akin to the one before us.

We begin with *Roe v. State ex rel. State Highway Department*, 103 N.M. 517, 710 P.2d 84 (1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). There, a patent from the state of New Mexico to the current landowners' predecessor in title had reserved to the state "all minerals of whatsoever kind." The New Mexico highway department entered into a highway construction contract which purportedly granted the contractor the right to enter the land and remove gravel for highway building purposes. The contractor did so, extracting gravel to a depth of some 30 feet. The landowners sued, claiming ownership of the gravel. The court held that under New Mexico case law, sand and gravel are not included within the scope of a general mineral reservation in a contract of sale or patent. *Id.*, 710 P.2d at 87[3]. Consequently, ownership of the sand and gravel passed with the patent to the landowners' predecessor in title. *Id.* at 88[4].

In *Elkhorn City Land Co. v. Elkhorn City*, 459 S.W.2d 762 (Ky.1970), a deed from a corporation to a municipality provided that the "coal, oil, gas and minerals and mineral substances with free right to mine, and market the same, are not conveyed in this deed." Some years later the Kentucky highway department awarded a contract for a reconstruction project on a road near the property. The city sold fill material— sandy clay loam and sandy shale—to the contractor over the protest of the corporation, which claimed ownership thereof. The court held that such material was not reserved by the corporation in its deed to the municipality. *Id.* at 765[5].

In *Harper v. Talladega County*, 279 Ala. 365, 185 So.2d 388 (1966), the plaintiff's predecessor in title was granted "[a]ll the coal, iron ore, and other minerals in, under and upon" certain land. The plaintiff sued the county for payment for sand and gravel removed from the land and used for construction, maintenance and repair of roads. The court took notice that sand and gravel used for road building and repair are obtained from open pits, and in the process of removing the sand and gravel the surface is destroyed. 185 So.2d at 393[5]. To uphold the plaintiff's claim, reasoned the court, it would be compelled to hold that the plaintiff's grantor, in conveying the coal, iron ore, and other minerals, intended to convey the land itself. *Id.* The court refused to ascribe such meaning to that language. Judgment rejecting the plaintiff's claim was affirmed.

In *Farrell v. Sayre*, 129 Colo. 368, 270 P.2d 190 (banc 1954), a grantor executed a warranty deed "excepting and reserving all mineral and mineral rights and rights to enter upon the surface of the land and extract the same." A dispute subsequently arose between the grantor and a successor in interest to the grantee regarding ownership of gravel removed from the land by a railroad for use as ballast for its roadbed. The court cited the following excerpt from *Waring v. Foden*, (1932) 1 Ch. 276, 86 A.L.R. 969, 979:

> "The two main principles to be gathered from these pronouncements are, first, that the word 'minerals' when found in a reservation out of a grant of land means substances exceptional in use, in value and in character ... and does not mean the ordinary soil of the district which if reserved would practically swallow up the grant ... and, secondly, that in deciding whether or not in a particular case exceptional substances are 'minerals' the true test is what that word means in the vernacular of the mining world, the commercial world and landowners at the time of the grant, and whether the particular substance was so regarded as a mineral ..."

In *Farrell*, the entire surface of the land conveyed was nothing but sand and gravel. *Farrell* held it was clear that at the time the deed was executed, the grantor had no intention of reserving to himself that which he had granted, namely, the sand and gravel surface of the land. 270 P.2d at 193. Judgment in favor of the grantor was reversed.

In *Waring*, cited in *Farrell*, a deed excepted and reserved "all mines minerals and mineral substances within or under" the deeded land, together with "full power and liberty for the vendor ... to work and get the same by underground workings only ..." 86 A.L.R. at 970. The court held that the reservation did not operate to reserve sand and gravel lying within or under the land granted. *Id.* at 978. The opinion of Lord Hanworth, M.R., observed:

"It seems to me that it would be a negation of the substance of the transaction to hold that all sand and gravel, which is very generally a part of the soil and subsoil of this farm and worked and gotten from the surface, was excepted from the grant and remained the property of the plaintiff. It would not be a reservation of what is exceptional, but of what is general and of general importance to the utility and efficiency of the land conveyed." *Id.*

In *Witherspoon v. Campbell*, 219 Miss. 640, 69 So.2d 384 (1954), a grantor executed a deed conveying "the surface rights and all timber lying in, on or growing on" a parcel of land. The deed contained a clause by which the grantor reserved to herself "all minerals now owned by me of every kind and nature, both liquid and solid, with the right of ingress and egress, and all necessary rights for the exploration and development of the same." The grantee arranged with a county official to excavate gravel to be used by the county for highway construction. The grantor sought an injunction barring the grantee from disposing of any gravel. Reversing a trial court judgment in favor of the grantor, the appellate court cited 58 C.J.S. *Mines and Minerals* § 155, pp. 324–25 (1948), for the proposition that sand and gravel ordinarily are not included within a grant or reservation of minerals or of mineral royalty, although there is on the land involved sand or gravel susceptible of commercial production and use. 69 So.2d at 386. Pointing out that any attempt by the grantor to utilize the gravel would result in the destruction or great impairment of the surface rights she had conveyed to the grantee, the appellate court held that the reservation did not include sand or gravel. *Id.* at 386, 389.

In *West Virginia Dept. of Highways v. Farmer*, 159 W.Va. 823, 226 S.E.2d 717 (1976), the state highway department, needing sand and gravel for road building, brought an eminent domain action against the owners of a parcel of land to obtain such materials. The holders of "mineral interests" in the land intervened, claiming the award should be theirs. The language of the deeds in the latters' chain of title reserved "the oil, gas and other minerals in and under said land." Applying the rule of *ejusdem generis*, the opinion held that the reservation did not include sand and gravel. 226 S.E.2d at 719–20[5, 6]. The court fortified its ruling by emphasizing that if the sand and gravel which lay principally on the surface could be taken by the holders of the mineral interests, the surface owners could be deprived entirely of the use of the surface, thus the conveyance to them would be useless. *Id.* at 720.

*Wulf v. Shultz*, 211 Kan. 724, 508 P.2d 896 (1973), involved a lease that granted the lessee "full and exclusive authority to enter upon said premises and to dig, drill, operate for and procure natural gas, petroleum and other mineral substances, together with the right of taking upon said premises and removing therefrom ... any machinery, tools, lumber, pipe, casing, and other things necessary in said work...." The lease further provided that if the lessee damaged fences or growing crops, the lessee would pay for such damage. Additionally, the lease provided that the lessee would drill no well within 200 feet of any existing building, and that all pipelines crossing cultivated land or meadows would be buried "beyond plow depth." Situated on the parcel was a strata of limestone

30–35 feet thick some 3 feet below the surface, with outcroppings. It was relatively easy to quarry and of considerable value in the manufacture of cement. The owners of the fee interest in the parcel brought suit to limit the lessee's rights to exploration for and production of oil, gas and related minerals. The opinion concluded that the quarrying of limestone was not within the contemplation of the original parties to the lease. As the limestone would have to be mined by the open pit or strip-mining method, such operations would necessarily destroy the surface for agricultural or grazing purposes. 508 P.2d at 900. The court held that the parties, in using the words "natural gas, petroleum and other mineral substances," did not intend that the mineral estate destroy the surface estate. *Id.* The court added that the items the lessee was authorized to bring onto and remove from the land were commonly found upon oil and gas leasehold operations, but not upon leaseholds used for removal of mineral substances other than oil and gas. *Id.* at 900–01. Consequently, said the opinion, the rights of the lessee were limited to exploration for and production of oil, gas and related minerals only. *Id.* at 902.

In *Fisher v. Keweenaw Land Association,* 371 Mich. 575, 124 N.W.2d 784 (1963), the defendant conveyed land to the plaintiffs' predecessors in title, reserving "all ores and minerals situated in, upon or under said land ... and the right at all times to enter upon said land ... and there explore, search, dig and mine for ores and minerals, and freely carry on the business of mining and removing ores and minerals...." The plaintiffs entered into an agreement with a construction company for the sale of sand and gravel from the premises for use in highway construction. The defendant claimed it owned the sand and gravel. The plaintiffs sued to quiet title. The appellate court noted that under the primary classification of matter as animal, vegetable, or mineral, sand and gravel must be considered as minerals. 124 N.W. 2d at 785–86. The court refused, however,

to give the term "minerals" so broad a meaning in construing the conveyance at issue. The court quoted with approval the following language from *Hendler v. Lehigh Valley R. Co.,* 209 Pa. 256, 58 A. 486, 487 (1904), a case dealing with whether sand was included in a reservation of coal and other minerals in, under, or upon a certain parcel of land:

> "But there is another, and what may be called the commercial, sense, in which the word 'mineral' is used, and in which, having reference to its supposed etymology of anything mined, it may be defined as any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific uses. That is the sense in which it is most commonly used in conveyances and leases of land, and in which it must be presumed that it was used by these parties in the deed in question ... Sand might or might not be in this category. A vein of pure white quartz sand, valuable for making glass or other special use, would be within the reservation, while common mixed sand, merely worth digging and removing as material for grading, would not be. The referee has found that the sand which is the subject of the present contention was of this latter character, and was taken and used, not for any intrinsic value or use of its own, but as part of earth and other material to fill up the roadbed to the proper grade. So regarded and used, it was not within the reservation."[7]

The appellate court in *Fisher* affirmed a judgment that the reservation in question did not include sand and gravel.

In *Heinatz v. Allen,* 147 Tex. 512, 217 S.W.2d 994 (1949), a landowner devised "the surface rights exclusive of the mineral rights" to one party, and "the mineral rights" to another party. A dispute arose regarding ownership of commercial limestone in the parcel. The court held that substances such as sand, gravel and limestone are not minerals within the ordinary

---

7. *Hall v. Delaware, L. & W.R. Co.,* 270 Pa. 468, 113 A. 669, 670–71 (1921), overruled *Hendler's* resolution of a point unrelated to whether sand was included in the reservation.

and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, e.g., sand that is valuable for making glass, and limestone of such quality that it may profitably be manufactured into cement. 217 S.W.2d at 997[5]. The court added that such substances, when useful only for building and road construction, are not regarded as minerals in the ordinary and generally accepted meaning of the word. *Id.* The opinion said:

> "The limestone on the land involved herein, having value only for building purposes, underlying most if not all of the land at varying and usually shallow depths, outcropping in all of the ravines, sometimes found on the top of the surface and removed by quarrying after scraping off the overlying caliche or other top soil, is so closely related to the soil, so nearly a part of the very surface, the soil itself, that it is reasonably and ordinarily considered a part of the soil and as belonging to the surface estate rather than as a part of the minerals or mineral rights." *Id.* at 997[6].

In *Salzseider v. Brunsdale,* 94 N.W.2d 502 (N.D.1959), the vendor in a contract for deed reserved to itself 50 per cent of "all oil, natural gas, or minerals which may be found on or underlying such land." The vendees sought a declaratory judgment that the reservation did not include gravel that might be found in or on the parcel. The court held that in construing the word "minerals" in the reservation, it could not do so according to the classifications of animal, vegetable or mineral nor according to the classifications of organic and inorganic substances. *Id.* at 503. The court explained:

> "To do so would include within the definition of 'minerals' a varying but in many cases a very substantial part of the soil itself and exclude from the definition such purely organic substances as oil, gas and coal, which at least in this locality are commonly regarded as 'minerals'." *Id.*

The court held that the reservation in issue did not include gravel.

*Kinder v. La Salle County Carbon Coal Co.,* 310 Ill. 126, 141 N.E. 537 (1923), involved a deed conveying to a coal company "all the bituminous or stone coal, together with the right to mine the same, underlying" a parcel of land. The deed further provided that the grantor "grants, conveys, quitclaims and releases to [the coal company] ... all the rights in or title to the oil and minerals, of every description, underlying the ... land ..." A dispute arose between the successors in interest to the grantor and the successors in interest to the coal company regarding ownership of "the agricultural surface, sand, gravel, shale, clay, and limestone." The trial court ruled that the deed to the coal company conveyed only minerals which had to be taken out by mining operations, that the parties thereto did not intend to pass title to any part of the surface, that limestone was a part of the surface, and that the successors in interest to the grantor had the right to use and remove the limestone, sand, gravel, clay and shale. Affirming the judgment, the appellate court observed there was no place on the parcel where it would be practicable to remove the limestone by underground methods without destruction of the topsoil or agricultural surface; the only practicable way of mining the limestone was by quarrying it from the top. 141 N.E. at 538. The opinion held that the quitclaim of "minerals, of every description," underlying the parcel could not reasonably be construed to embrace minerals other than such as could be removed by mining operations underground, which would not destroy the surface for agricultural purposes. *Id.* at 540.

In *Holland v. Dolese Co.,* 540 P.2d 549 (Okla.1975), the owner of a parcel of land and the holders of half the mineral rights therein got into a dispute over limestone commercially quarried and removed from the land. The limestone was used as aggregate in concrete, surface material on secondary roads without other additives, general construction material, and as agricultural limestone. It had not been used in the manufacturing process of making cement, as opposed to aggregate material in mixing concrete. The appellate court held that the limestone was a general part of

the soil and subsoil, that it had no peculiar property so as to be rare and exceptional in character, and that it was comparable to sand and gravel. *Id.* at 551–52[3]. Consequently, ruled the court, the limestone was not included in the reserved mineral rights. *Id.*

In *Rysavy v. Novotny,* 401 N.W.2d 540 (S.D.1987), the vendors in a contract for deed reserved half "of all the mineral rights" on a parcel of land. Afterward, the vendee sold a "rock-like substance" from the land to various purchasers, who used it to absorb moisture and improve the condition of dirt roads. A quarrel arose as to whether the material sold was a "mineral" under the reservation clause in the contract. An expert characterized the material as "quartzite rock" having no commercial value other than its use as an absorbent material. Evidence showed it could not be extracted without destroying the surface of the overlying land. The court declared that in such circumstances the widely accepted and most prudent rule dictates that any such material is not a reserved "mineral," absent specific language to the contrary or other showing that the parties intended otherwise. *Id.* at 542. The rationale, said the court, is that a reservation of such material would in reality effectuate a grant of very little or nothing to the surface owner, and that the parties would not intend to negate the substance of their transaction. *Id.* at 542–43. Furthermore, said the court:

> "... the trial court's ruling may well have placed into question the ownership of the surface and subsurface of significant portions of western South Dakota. Affidavits ... stated the material ... was common in that area of the state.... Therefore, the trial court's ruling if allowed to stand could result in destruction of the surface and unsettle the ownership of this and other land bearing similar title reservations." *Id.* at 543.

Summary judgment in favor of the surviving vendor was reversed.

*Bambauer v. Menjoulet,* 214 Cal.App.2d 871, 29 Cal.Rptr. 874 (1963), involved a deed in which the grantor reserved a half interest "in and to all mineral, and oil rights" in the demised land. The grantor subsequently claimed a half interest in gravel removed from a streambed on the land. Evidence showed that the material was valuable only "as ordinary gravel," and that it was impractical to extract any elements from it. The court held that the gravel did not come within the term "mineral" in the reservation.

Finally, we consult *W.S. Newell, Inc. v. Randall,* 373 So.2d 1068 (Ala.1979), perhaps the case factually nearest the instant case. In that case a grantor reserved to herself an interest "in and to any and all gas, oil, sulphur, clay, gravel or other minerals from said land." Through mesne conveyances a corporation became the landowner. The corporation removed some 530,000 cubic yards of soil from the parcel for use as fill dirt in constructing an interstate highway. The grantor claimed royalties for the material removed. Expert testimony showed that the material "varied from light sandy top soil with organics in the surface ... [b]ut the ... major portion ... was what is known as good quality sand clay having eight to fifteen to sixteen percent clay and the rest of it sand and it was the sand that binds the clay and makes it permissible to use for ... highway road surfacing under the asphalt." The appellate court, emphasizing that the reservation did not include sand (though it did include clay and gravel), held that the reservation did not include the material in question, "the doctrine of ejusdem generis notwithstanding." *Id.* at 1070–71[4]. The court said:

> "[The corporation], in effect, extracted ordinary soil to use as fill dirt in the interstate project. To hold that the soil was within the reservation ... would, in effect, reserve the land itself to [the grantor], something she purportedly divested herself of in the 1951 deed. Although there is no precise definition of the term 'mineral,' it necessarily implies a substance rare and exceptional in character possessing special value—something other than the soil itself." *Id.* at 1070[3].

Judgment for the grantor was reversed.

Evaluating the instant case by the standards set forth in the authorities we have

synopsized, we observe that McDonald conceded at trial that the material in dispute was "clay and rock." A mining engineer and geologist employed by American Zinc from 1944 through 1978, testifying for McDonald, acknowledged that the material in dispute was used "for fill dirt to build the overpass." A professional geologist and engineer testifying for Snyder characterized the material in dispute as "a limestone residual silty clay loam, containing the normal elements and minerals one would expect in this area ... [it's] ordinary dirt." It is thus indisputable that the material in issue was not excavated for the purpose of refining, smelting, or other processing in order to extract any particular element or substance therefrom. It was merely moved to another site in its unaltered state for use as fill.

Furthermore, we have already reported that the material was dug from an area 12 to 15 acres in size, beginning at the surface and extending downward 5 to 8 feet. That means between 30 and 38 per cent of the surface of the 40–acre subject tract was destroyed.

We find it significant that the reservation in the 1962 deed from American Zinc to the Pendergrafts [8] reserved the right to use so much of the surface "as may be necessary for prospecting, mining and milling," and provided that American Zinc could purchase such part of the surface "as it may require for mining and/or milling purposes." Such provisions imply that American Zinc did not contemplate destroying a sizeable portion of the surface by carrying away the top 5 to 8 feet of ground.

It is also noteworthy that American Zinc, in the 1962 deed, reserved "all tailings, boulders and mine refuse" from operations thereafter conducted. If (as McDonald asserts) the reservation of "other minerals" included the material in dispute, the reservation of tailings, boulders and mine refuse would have been superfluous.

Additionally, the reservation in the 1962 deed refers to prospecting, mining, milling and drilling, and it addresses the subject of the location of shafts and plants. Such terminology bespeaks activity of a different character than scooping up ground from the surface and depositing it elsewhere for fill.

Finally, the trial court, as we have seen, found that the material in dispute was "common ordinary soil abundantly indigenous to this area." [9] To hold that such material was reserved by American Zinc in the 1962 deed would mean that the Pendergrafts—who ostensibly received title in fee simple absolute—received in reality very little. In the words of *Waring,* 86 A.L.R. at 979, such holding would result in the reservation practically swallowing up the grant.

We therefore hold that the trial court was correct in ruling that the material in dispute was not reserved by American Zinc in the 1962 deed to the Pendergrafts. It follows that we need not consider whether the 1974 or 1979 deeds from Azcon Corporation to McDonald conveyed to him everything reserved by American Zinc in the 1962 deed.

In reaching our decision, we have not overlooked cases cited by McDonald that have thus far gone unmentioned. Those cases, in our judgment, did not resemble the instant case to a sufficient degree to be persuasive. For example, *Western Development Co. v. Nell,* 4 Utah 2d 112, 288 P.2d 452 (1955), *Shell Oil Co. v. Dye,* 135 F.2d 365 (7th Cir.1943), and *Sult v. A. Hochstetter Oil Co.,* 63 W.Va. 317, 61 S.E. 307 (1908), dealt with oil and gas; *McCombs v. Stephenson,* 154 Ala. 109, 44 So. 867 (1907), concerned shale that was ground up and made into brick; *United States ex rel. Tennessee Valley Authority v. Harris,* 115 F.2d 343 (5th Cir.1940), involved chert, silt, sand, and limestone; *Cole v. McDonald,* 236 Miss. 168, 109 So.2d 628 (1959), pertained to bentonite; *Acker v. Guinn,* 464 S.W.2d 348 (Tex.1971), concerned iron ore; *Shell Petroleum Corp. v. Liberty Gravel & Sand Co., Inc.,* 128 S.W.

---

**8.** Footnote 1, *supra.*

**9.** Finding "22," *supra.*

2d 471 (Tex.Civ.App.1939), held that building sand was not included in "all other minerals"; *Puget Mill Co. v. Duecy*, 1 Wash.2d 421, 96 P.2d 571 (1939), upheld the dismissal of a petition averring that the removal of sand and gravel violated a reservation of "all oils, gases, coal, minerals, metals and fossils of every name and nature"; *Board of Zoning Appeals of the City of Plymouth v. Heyde*, 160 Ind.App. 165, 310 N.E.2d 908 (1974), involved an alleged violation of a zoning ordinance where neither party contended that gravel was not a "mineral resource" within the scope of a state statute; *Loney v. Scott*, 57 Or. 378, 112 P. 172 (1910), dealt with whether building sand was a mineral within the meaning of certain federal legislation.

The only Missouri case cited by McDonald, *Mexico Refractories Co. v. Roberts*, 237 Mo.App. 299, 167 S.W.2d 660 (1942), is likewise inapposite. The dispute there was over a fire clay pit, part of which was on land described in the plaintiff's deed and part of which was not. McDonald, in his brief, tells us that the appellate court in that case "impliedly accepted the mineral status for fire clay by calling a lease of a fire clay pit a mineral interest." McDonald fails to identify the passage in the opinion where the appellate court did so, and our scrutiny of the opinion persuades us that McDonald misreads it. Nowhere does the appellate court say or imply that the lease of the pit conveyed a "mineral interest."

McDonald cites no case where ground removed from the top few feet of one parcel of land and used in its unaltered state as fill for a construction project on another parcel has been held to be a mineral within the scope of a grant or reservation of mineral rights between private parties. All of the pertinent cases, as we have seen, reach the opposite result.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.